

**NUMBER 13-06-00158-CV**

**COURT OF APPEALS**

**THIRTEENTH DISTRICT OF TEXAS**

**CORPUS CHRISTI - EDINBURG**

---

**$281,420.00 IN U.S. CURRENCY,**                          **Appellant,**

**v.**

**THE STATE OF TEXAS,**                                 **Appellee.**

---

**On appeal from the 398th District Court
of Hidalgo County, Texas.**

---

**MEMORANDUM OPINION**

**Before Chief Justice Valdez and Justices Garza and Vela
Memorandum Opinion by Justice Garza**

This appeal arises from a forfeiture proceeding involving $281,420.00 in United States currency.[1] *See* TEX. CODE CRIM. PROC. ANN. arts. 59.01(2)(A), (B), 59.02(a) (Vernon 2006). By four issues, appellant, Gregorio Huerta, contends the trial court erred in (1)

---

[1] The parties refer to the United States currency seized as both "money" and "currency." For consistency, we will refer to the amounts seized as "currency."

denying his no-evidence motion for summary judgment, (2) granting the State's motion for judgment notwithstanding the verdict, (3) denying his motion to disregard the jury answer to question number 3, and (4) entering a judgment providing that he recover nothing. We reverse and render judgment in favor of appellant.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### a. Huerta's Testimony

Huerta testified that he owns a wrecker service in Edinburg, Texas, known as "Greg's Towing." He has been in the wrecker service business since November of 1998. He owns and operates one large wrecker and specializes in towing heavy equipment such as tractor trailers and oversized equipment. On the evening of May 25, 2002, while at the Edinburg race track with his wrecker, Huerta was approached by Johnny Mercado.[2] Mercado asked Huerta if he provided out-of-town towing services, and Huerta responded that he did. Mercado subsequently hired Huerta to transport a 1992 Freightliner tractor from Alvin, Texas, near Houston, to Mercedes, Texas, for an estimated charge of $2,826.00.[3]

Huerta testified that he left to Alvin to retrieve the Freightliner at about 1:30 a.m. that same evening. He arrived in Houston at about 7:30 or 8:00 a.m. on May 26 and proceeded to the residence in Alvin to pick up the Freightliner. Huerta did not make contact with anyone at the residence; instead, he just "hooked up the truck," which had the

---

[2] Although Huerta's testimony reflects that he was at the race track on May 25, the contract for tow services indicates the date was actually May 24. Furthermore, in an affidavit, Department of Public Safety ("DPS") Trooper Cesar Torres identifies Johnny Mercado as the owner of the trucking company who paid the towing fee to Huerta.

[3] The State and Huerta offer different characterizations of the vehicle towed by Huerta. The State contends that the vehicle towed was a tractor while Huerta notes that the vehicle was a truck or a Freightliner. We will refer to the vehicle as a Freightliner.

2

keys in the ignition, and proceeded to tow it to the Valley.[4] Huerta arrived back in the Valley between 3:30 and 5:00 p.m. Huerta testified that he called Mercado and informed him that he was back at his office in Edinburg and that he asked Mercado to come by and pay him for the towing services.[5] Mercado told Huerta that he would be there in thirty minutes; however, thirty minutes elapsed and Mercado did not show up. Huerta "called [Mercado] again to notify [Mercado] that [he] wasn't going to be there that day, that [he] had to go have dinner."

Huerta testified that he called Department of Public Safety ("DPS") Trooper Cesar Torres because Mercado never went to his office to pay him and because he began to suspect the Freightliner was stolen.[6] According to Huerta, Torres was supposed to go to Huerta's office and identify the Freightliner to determine if it was stolen. However, Mercado showed up and paid Huerta for the towing services before Torres arrived. Huerta then called Torres to inform him that Mercado had shown up to pay for the services and he told Torres to "disregard." Huerta claimed that Torres responded that he still wanted to look at the Freightliner, so, he and Torres entered into a plan whereby Huerta would speed while en route to Mercedes in order to give Torres probable cause to stop him.

Huerta explained that he was supposed to follow Mercado from his office to the

---

[4] The "Valley," otherwise known as the "Rio Grande Valley," is an area located in the southernmost tip of Texas. It lies along the northern bank of the Rio Grande, which separates Mexico from the United States. The region is made up of four counties: Starr County, Hidalgo County, Willacy County, and Cameron County. The largest city is Brownsville (Cameron County), followed by McAllen (Hidalgo County). Other major cities include Harlingen, Mission, Edinburg, and Pharr.

[5] Huerta explained that, although he was hired to tow the Freightliner to Mercedes, he always stops at his office to secure payment . Once payment is made, Huerta delivers the vehicles.

[6] Huerta explained that he called Trooper Torres because Torres had always helped him in the past by advising him not to release a vehicle until he was paid. Huerta also testified that he and Torres were personal friends, he claimed he had gone to Torres' house, had lunch with Torres, and worked accidents with Torres in the past.

3

location where he was to deliver the Freightliner. However, because of his plan with Torres, Huerta did not follow Mercado. Instead, Huerta passed Mercado's vehicle and proceeded with the plan to speed. Torres subsequently pulled Huerta over in San Juan, Texas.[7] Mercado did not stop but instead "circled around there two or three times." Huerta told Torres that Mercado was driving around and asked if Torres wanted to talk to Mercado. Torres told Huerta that he did not need to talk to Mercado. Huerta subsequently gave Torres verbal and written consent to search the Freightliner and even participated in searching the Freightliner himself. Nothing was found in the Freightliner during the roadside search in San Juan. Torres then asked Huerta to tow the Freightliner to the United States Customs point of entry at the International Bridge in Hidalgo, Texas. Huerta agreed to do so.

Once they arrived at customs, the Freightliner was x-rayed but nothing suspicious was discovered. Federal and State officers and drug detection dogs inspected the Freightliner, and again, nothing unusual was discovered. At this point, Huerta was free to leave. Subsequently, Huerta removed the oil plug from the bottom of the Freightliner's axle. Huerta stuck his finger in the opening and felt plastic. Huerta told the officers, "[t]here is something in here." Huerta, using his own tools, proceeded to open the hub compartment where he discovered "little bundles wrapped in gray duct tape." Huerta took the packages out and started "pitching [the packages] to some of the Custom[s] Agents." Huerta cut open the packages and discovered that they contained United States currency. After the currency was found, Torres instructed Huerta to follow him to the McAllen Highway Patrol Office to deliver the Freightliner and so that the currency could be counted

_____

[7] Torres gave Huerta a warning ticket for driving 88 miles an hour.

4

in front of Huerta. The currency amounted to a total of $281,420. Huerta subsequently relinquished custody of the Freightliner and the currency to the Highway Patrol when he left it at the Department of Public Safety on May 25, 2002.

Huerta further testified that after relinquishing custody of the currency and the Freightliner, he called Mercado, leaving him a message that the Freightliner was left at the Department of Public Safety. In his message, Huerta also noted that currency was found in the Freightliner and that Mercado should call him or the Highway Patrol with any questions. Huerta denied ever hearing back from Mercado or Jesus Rebolledo Pulido, the registered owner of the Freightliner, regarding the Freightliner or the currency. Huerta also noted the following:

Q: After that evening, did you ever—did you ever call DPS to see about the tractor [Freightliner]?

A: Yes, that—they told me no one claimed it, they were going to give me a reward, 30 percent, that no one claimed it. And I called, and finally Trooper Torres asked me to go talk to the narcotics sergeant. And they told me, I'm not allowed to give you no—percentages of it, because—because you turned it over to the highway department. I'm another department. Go back and talk to them. They are the ones that are going to reward you, not me. Then when all that happened, Cesar Torres had several conversations with him. He's the one that advised me, Go get a lawyer, Greg, and sue them because—because I don't see it right.
. . . .

Q: Okay. Right. And is it your understanding you are going to get 30 percent of 281,000?

A: Yes, sir.

Q: Even though you had been paid 2,800 to do the towing job?

A: Yes, sir.

Huerta reasoned that because he was the person who found the currency and because

5

he was the last person in possession of the currency prior to seizure, he is entitled to the currency.

**b. Trooper Torres's Testimony**

Trooper Torres testified that the only time he had met Huerta, prior to this incident, was when he pulled Huerta and his girlfriend over for driving in excess of 100 miles per hour on State Highway 281 in a Lamborghini. Torres further testified that Huerta had requested assistance from Trooper Lopez on the evening of May 25, 2002, but since Trooper Lopez was not at the station at that time, Torres took the phone call. Torres noted that Huerta "seemed to be nervous that there were some male subjects there at his residence." Torres corroborated Huerta's testimony as to the plan for Huerta to speed in order to give Torres probable cause to stop and search the Freightliner for contraband. Torres noted that while he was conducting the search, a car carrying the owner of the Freightliner, Mercado, turned around and drove by the scene very slowly, which made him suspicious of the circumstances.

In the course of his investigation, Torres inquired about how much Huerta was being paid to tow the Freightliner. Torres initially testified that Huerta was paid $1,800 for the towing job, but after the State introduced Huerta's bill into evidence, Torres testified that Huerta was paid $2,800 for the job. After Torres's inquiry about Huerta's bill, Torres secured Huerta's written consent to search the Freightliner. Once he obtained Huerta's consent, Torres conducted a thorough investigation of the Freightliner, yet found nothing.[8] Torres claims he then secured Huerta's consent for the Freightliner to be x-rayed and

---

[8] Trooper Torres also testified that he noticed that the middle axle of the Freightliner was missing something, which appeared strange.

subjected to a K-9 search for drugs at the United States Customs port of entry at the International Bridge in Hidalgo.

While at United States Customs, x-rays of the Freightliner were conducted. Torres testified that the x-rays revealed that the two axles in the rear and the engine compartment were dark and inconclusive. The Freightliner was further subjected to a K-9 search for contraband and a search of the engine compartment and the rear axles by various troopers. No drugs were found as a result of the searches. Torres stated that he was present at the scene when the currency was found, but did not personally observe Huerta finding the currency.[9] Torres stated that at least ten officers and troopers participated in the search of the Freightliner.[10] Torres also established that Huerta assisted in the search of the Freightliner, but noted that he was unsure if Huerta was the one who found the currency.

Torres testified that the currency was contained in twenty or thirty bundles wrapped with electrical tape. Torres further testified that once the bundles were removed from the axle, the troopers proceeded to cut the bundles on the side to determine the nature of the find. Once the troopers identified the bundles as United States currency, Sergeant Noel Zuniga and Trooper James Davidson took the currency back to DPS narcotics in McAllen, Texas to count the currency seized. Torres noted that Huerta was present during the counting of the currency and was contacted by a DPS narcotics agent. After counting the currency, Torres and the other troopers submitted a seizure affidavit and other paperwork

---

[9] The character of the currency found is hotly contested. The State seeks to characterize the currency as contraband and subject to forfeiture while Huerta asserts that the currency is not contraband and that he is entitled to it given that he was in possession of the Freightliner at the time of the discovery.

[10] Among the officers and troopers participating in the search were Trooper James Davidson, Trooper David Pena, Sergeant Noel Zuniga, and approximately seven to nine United States Customs agents.

with the Hidalgo County District Attorney's Office to commence forfeiture of the Freightliner and the currency. Torres and the troopers also attempted to identify the owners of the Freightliner using the Freightliner's vehicle identification number and running the Freightliner's license plates in the law enforcement database. As a result of their inquiry, Torres and the troopers discovered that the Freightliner was registered to Pulido. However, Torres was unsure as to who the currency belonged to at that time. Torres indicated that after all of this, he initiated contact with Huerta on a couple of occasions to discuss the progress of the case, but that at no time did Huerta indicate that the currency was his.

On cross-examination, Torres testified that Huerta was in sole control of the Freightliner until Torres directed Huerta to drive the Freightliner to United States Customs in Hidalgo. Torres further testified that Huerta and Torres were in joint control of the vehicle once the investigation commenced at United States Customs in Hidalgo.[11] Torres admitted that the consent search form that Huerta signed was a local agreement between DPS and the Hidalgo County District Attorney's Office and was not applicable to the federal

---

[11] The following exchange occurred between Assistant Criminal District Attorney Timm Davis and Trooper Torres:

Q:  Did Mr. Huerta ever have the money, apart from DPS and Customs?

A:  Did he ever have the money?

Q:  Did he ever have the money once you all found the packages and said, Hey [sic], there is a bunch of money here?

A:  No, he didn't. We had control of that money all the time.

Q:  And once it was discovered that there was [$]281,420, did Mr. Huerta—did he say, That's [sic] my money, I forgot about that, you know, I put that in there, it's my money, why don't you give it to me, anything like that?

A:  No, he didn't.

agents at United States Customs in Hidalgo. Torres further testified that Huerta was in sole control of the Freightliner and that he believed that Huerta was the owner of the Freightliner when he obtained Huerta's consent to search the Freightliner in San Juan and at U.S. Customs. Torres also admitted that Pulido was the registered owner of the Freightliner and that Pulido had failed to assert a claim for the confiscated currency. Finally, Torres testified that Huerta assisted officers in the movement and counting of the currency.

### c. Forfeiture Proceedings

The State filed separate and independent lawsuits seeking forfeiture of the Freightliner and of the currency.[12] The proceeding concerning the forfeiture of the currency was filed on June 18, 2002. In its third amended original petition, the State noted that: (1) Mercado, who had been served with citation and petition, had failed to answer or appear; (2) Pulido, who had also been served with citation and petition, also failed to answer or appear; and (3) the trial court appointed Oscar Alvarez to serve as attorney-ad-litem for Pulido.[13] In its pleading, the State asserted that the currency was contraband as defined by article 59.01(2)(A) and (2)(B) of the Texas Code of Criminal Procedure and thus subject to seizure and forfeiture pursuant to article 59.02(a). *See* TEX. CODE CRIM. PROC. ANN. arts. 59.01(2)(A),(B), 59.02(a). The State further asserted that "the seizure of the currency was made pursuant to a lawful arrest, lawful search, or lawful search incident to arrest." *Id.* art. 59.03(b)(4) (Vernon 2006). The State asked the trial court to (1) find that the

---

[12] The Freightliner was forfeited without dispute. In the present case, Huerta explained that he did not intervene in the forfeiture proceeding relating to the Freightliner "because—the value of that truck and what it's going to take to fix that truck, it's not worth it."

[13] At trial, Alvarez stated that he had been unable to make contact with Pulido throughout the course of the proceeding.

9

currency constituted contraband, (2) allow forfeiture of the currency pursuant to article 59.05(e), *see id.* art. 59.05(e) (Vernon 2006), and, (3) allow that the currency be disposed of pursuant to article 59.06, *see id.* art. 59.06 (Vernon 2006).

On August 2, 2002, Huerta filed a petition in intervention. On February 18, 2005, Huerta filed an amended petition in intervention, alleging among other things that: (1) he was in possession of the Freightliner and all of its contents, or, alternatively, was in joint possession thereof with the State; (2) Mercado and Pulido abandoned the property and any claim to it by failing to appear after proper service; (3) his interest in the currency is superior to the State's; and (4) the currency is not contraband. In his original petition in intervention, Huerta claimed that he had standing to intervene in the forfeiture proceeding "because he was in possession of the currency at the time it was seized." *See id.* art. 59.04(j) (Vernon 2006) (providing, "[a] person who was in possession of the property at the time it was seized shall be made a party to the proceeding."); *Id.* art. 59.03(d) (Vernon 2006) (providing, in relevant part, that "[a] person in the possession of property at the time a peace officer seizes the property under this chapter may at the time of seizure assert the person's interest in or right to the property.").[14] On April 3, 2003, Huerta filed an unopposed motion to exclude expert testimony; the motion was granted on May 23, 2003.[15]

---

[14] As previously mentioned, Huerta testified that he called Mercado and left a message informing Mercado that the Highway Patrol kept the Freightliner "in reference to there was money found in there" and instructing Mercado to call him or the Highway Patrol with any questions. Huerta claimed that he never heard from Mercado or anyone else regarding the Freightliner. Mercado did not come forward to claim an interest in either the Freightliner or the currency.

[15] In the State's response to intervenor's request for disclosure, it listed the names, addresses, and telephone numbers of eleven officers of the Texas Department of Public Safety and the United States Customs Service and the names of three civilians. The State also noted that:

Response: Plaintiff has not retained any expert witnesses. Some or all of the law enforcement personnel identified above may testify partly in their capacities as experienced narcotic agents with specialized training in that area and may offer expert opinions regarding the movement of currency from the interior of the United States to the border region/Mexico

On April 24, 2003, Huerta filed a no-evidence motion for summary judgment claiming (1) the State failed to make Huerta a party to the proceedings within thirty days, *see id.* art. 59.04(a), (j), (*l*), and (2) there was no evidence that the currency is contraband. *See* TEX. R. CIV. P. 166a(i). The State filed its response to Huerta's no-evidence motion for summary judgment on May 12, 2003. On May 16, 2003, Huerta filed a motion to strike the State's response to his no-evidence motion for summary judgment. Huerta claimed the State failed to file its answer within seven days of the May 12, 2003 submission date and failed to obtain leave of court to file its response outside the seven days. *See* TEX. R. CIV. P. 166a(c).[16] On November 20, 2003, Huerta filed special exceptions to the State's second amended petition alleging the State failed to give reasonable notice of what makes the currency in question "contraband" under article 59.02 of the Texas Code of Criminal Procedure and asking the trial court to order the State to replead and "identify what provision or provisions of the Criminal Code of Procedure Article 59.02(A) and (B) it claims have some nexus to this currency. . . ." *See* TEX. CODE CRIM. PROC. ANN. art. 59.02. On February 18, 2005, Huerta filed supplemental special exceptions to the State's third amended petition alleging that the State failed "to attach or incorporate a legally sufficient affidavit upon which forfeiture pursuant to Chapter 59 of the Texas Code of Criminal Procedure is permitted." Huerta asked the trial court to strike Trooper Torres' testimony

---

with regard to narcotic trafficking.

Huerta, in his unopposed motion to exclude expert testimony, alleged that (1) the State had not timely designated its expert witnesses, (2) the State exercised control over at least six of the proffered expert witnesses who were considered state employees with agencies that had a stake in the outcome, and (3) the proffered expert testimony would unduly prejudice his case.

[16] Huerta claims his motion to strike was denied; however, he has failed to direct our attention to any order or place in the record where a ruling, whether written or oral, can be found.

11

from the affidavit and to direct the State to file a non-suit so that the case could be dismissed. On November, 9, 2005, the trial court held a pre-trial hearing on Huerta's no-evidence motion for summary judgment and on Huerta's special exceptions. The trial court denied Huerta's no-evidence motion for summary judgment and special exceptions.[17]

The case was argued before a jury on November 9, 2005.[18] At trial, the State argued that at all times Huerta consented to searches by DPS Troopers and by U.S. Customs agents. The State further argued that Huerta's only role in this case was that "he was hired to transport the disabled tractor, supposedly disabled tractor, from Alvin down to the Valley." Finally, the State asserted that Huerta, as intervenor, was neither claiming that the currency was his nor that he knew about the currency; instead, Huerta was simply alleging that he should get the currency because he was towing the Freightliner where the currency was found.

Huerta countered by arguing that: (1) the currency was not contraband, (2) he was in possession of the currency at the time of seizure, (3) it was he who found the currency, and (4) because Mercado and Pulido abandoned the tractor and failed to assert a claim for either the Freightliner or the currency, he is entitled to the entire amount of currency seized.

At the conclusion of the evidence, the State moved for a directed verdict based on Huerta's lack of standing to contest the forfeiture action and asked that Huerta's

---

[17] The record does not contain written orders denying Huerta's no-evidence motion for summary judgment or special exceptions; however, the reporter's record reflects the trial court's oral rulings denying the no-evidence motion for summary judgment and the special exceptions.

[18] On this same day, the trial court, "being of the opinion that . . . by their default, [Mercado and Pulido] admitted the allegations in the [State's] Original Petition and Notice of Seizure and Intended Forfeiture . . . ," entered an interlocutory default judgment against Pulido and Mercado ordering that any right, title or interest they may have had in the currency was forfeited.

intervention in the case be stricken. The trial court denied the State's motion for directed verdict. The case was submitted to the jury in the form of a three-question charge which asked the jury to answer (1) whether the currency was contraband; (2) if they found that the currency was not contraband, whether Huerta was in actual or joint possession of the currency at the time it was seized, and (3) if they found that Huerta was in actual or joint possession of the currency, what amount should be awarded to Huerta. The jury: (1) found that the currency was not contraband; (2) found that Huerta was in actual or joint possession of the currency at the time it was seized; and (3) awarded Huerta $70,000.

On November 29, 2005, the State filed a motion for judgment notwithstanding the verdict ("JNOV"). Huerta filed a response to the State's motion on December 27, 2005, and he also filed a "Motion to Disregard Jury Answer Number 3 and For A Judgment For $281,420.00." On January 18, 2006, the trial court entered an order granting the State's motion for JNOV and an order denying Huerta's motion to disregard and for a judgment of $281,420. The trial court signed an order of final judgment on March 8, 2006. In its order, the trial court found that the currency constituted contraband and that Huerta did not show that he was the owner of the currency or that he had any legal right to claim any or all of the currency. The trial court ordered that the $281,420 be forfeited to the Hidalgo County Criminal District Attorney and the Texas Department of Public Safety. The court noted that default judgments had been entered against Pulido and Mercado and ordered that they recover nothing. This appeal ensued.

## II. NO-EVIDENCE MOTION FOR SUMMARY JUDGMENT

By his first issue, Huerta claims that the trial court erred in denying his no-evidence motion for summary judgment. As stated above, Huerta moved for summary judgment on

13

the grounds that the State failed to make him a party to the proceedings within thirty days as required by article 59.04, and that there was no evidence that the currency was contraband. However, after a trial on the merits, as in the present case, the denial of a motion for summary judgment may not be reviewed on appeal, and the motion itself does not preserve for appeal the issues raised in the motion. *Ackermann v. Vordenbaum*, 403 S.W.2d 362, 365 (Tex. 1966); *Tricon Tool & Supply, Inc. v. Thumann*, 226 S.W.3d 494, 509 (Tex. App.–Houston [1st Dist.] 2006, pet. denied) (holding that after a trial on the merits, as in the present case, the denial of a motion for summary judgment may not be reviewed on appeal); *Daniel v. Falcon Interest Realty Corp.*, 190 S.W.3d 177, 187-88 (Tex. App.–Houston [1st Dist.] 2005, no pet.) (holding that when a party unsuccessfully moves for summary judgment and subsequently loses in a conventional trial on the merits, denial of that motion generally is not subject to review on appeal); *Reese v. Duncan*, 80 S.W.3d 650, 665 (Tex. App.–Dallas 2002, pet. denied) (citations omitted); *Johns v. Ram-Forwarding, Inc.*, 29 S.W.3d 635, 638-39 (Tex. App.–Houston [1st Dist.] 2000, no pet.). Accordingly, we hold that Huerta has presented nothing for our review on this issue. We overrule Huerta's first issue.

### III. JUDGMENT NOTWITHSTANDING THE VERDICT

By his second issue, Huerta asserts that the trial court erred in granting the State's motion for JNOV.

A trial court may grant a motion for JNOV if a directed verdict would be proper or if no evidence supports one or more of the jury findings. *See* TEX. R. CIV. P. 301; *Tiller v.*

14

*McLure*, 121 S.W.3d 709, 713 (Tex. 2003).[19]  The trial court may grant a motion for JNOV

on grounds not raised in the motion.  *See McDade v. Texas Commerce Bank, Nat'l Ass'n*,

822 S.W.2d 713, 718 (Tex. App.–Houston [1st Dist.] 1991, writ denied) (holding that, in

ruling on the motion for JNOV, the trial court was not prevented from ruling on the issue

of whether the DTPA claim was barred by the statute of limitations even though the issue

was not raised in the motion for JNOV).  When a party moves for JNOV on multiple

grounds and the trial court grants JNOV without specifying which ground it found decisive,

the appellant must show that JNOV was not proper on any of the asserted grounds.  *Fort*

*Bend County Drainage Dist. v. Sbrusch*, 818 S.W.2d 392, 394 (Tex.1991).  In the present

case, the trial court did not specify the ground on which it granted the State's motion for

JNOV.

An appellate court reviews a JNOV under a no-evidence standard of review; i.e., a

legal sufficiency review.  *City of Keller v. Wilson*, 168 S.W.3d 802, 823 (Tex. 2005) (stating

that "the test for legal sufficiency should be the same for summary judgments, directed

verdicts, judgments notwithstanding the verdict, and appellate no-evidence review");

*Escoto v. Estate of Ambriz*, 200 S.W.3d 716, 722 (Tex. App.–Corpus Christi 2006, pet.

granted); *Williams v. Briscoe*, 137 S.W.3d 120, 124 (Tex. App.–Houston [1st Dist.] 2004,

no pet.).  Under this standard of review, we will affirm the JNOV only if the record reveals

one of the following:  (1) the complete absence of a vital fact, (2) the court is barred by the

rules of law or of evidence from giving weight to the only evidence offered to prove a vital

---

[19] A directed verdict is proper when the evidence conclusively proves a fact that establishes a party's right to judgment as a matter of law or when the evidence offered on a cause of action is insufficient to raise an issue of fact. *See Kline v. O'Quinn*, 874 S.W.2d 776, 785 (Tex. App.–Houston [14th Dist.] 1994, writ denied).

15

fact, (3) the evidence offered to prove a vital fact is no more than a scintilla, or (4) the evidence conclusively established the opposite of the vital fact. *City of Keller*, 168 S.W.3d at 810. More than a scintilla of evidence exists if the evidence "rises to a level that would enable reasonable and fair-minded people to differ in their conclusions." *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003). If the evidence does no more than create a mere surmise or suspicion of fact, less than a scintilla of evidence exists. *Id.* In our review, we consider only the evidence and reasonable inferences that tend to support the jury's findings. *Best v. Ryan Auto Group, Inc.*, 786 S.W.2d 670, 671 (Tex. 1990) (per curiam); *Williams*, 137 S.W.3d at 124. That is, we view the evidence in the light most favorable to the verdict. *Williams*, 137 S.W.3d at 124. When there is more than a scintilla of competent evidence to support the jury's finding, the JNOV should be reversed. *Mancorp, Inc. v. Culpepper*, 802 S.W.2d 226, 228 (Tex. 1990).

In its motion for JNOV, the State asserted that the trial court should disregard the jury's verdict because:

> There was no evidence that [Huerta] was the owner of all or any of the currency, in fact [Huerta] plainly stated that the money was not his. [Huerta's] argument to the jury is that he should be "rewarded" for his involvement in the case, ie. [sic] calling the DPS, assisting in the search of the truck-tractor, allowing his tools to be used in the search, etc., but there is no authority, either statutory or in common-law, for the jury to make such a reward.

In his response to the State's motion for JNOV, Huerta asserted that: (1) he had a "possessory" right to the currency as a bailee having been hired to tow the Freightliner pursuant to a written contract; (2) he had an interest in the currency under article 59.04(j) because he was the last person in possession of the currency before it was seized; (3) he had a right to regain possession of the currency under Texas law because "there is no

16

'owner' claiming a greater right that [sic] [him], who was the 'finder'" and because the other possible claimants were properly served and defaulted; and (4) his argument to the jury was not, as the State contends, that he should be rewarded; instead, his argument was that he was the last person in possession before seizure, that the currency is not contraband, and that as the "finder," he is entitled to the abandoned currency. Huerta further asserted that, pursuant to Chapter 59 of the Texas Code of Criminal Procedure, the State has no right to the currency unless it is contraband.

## A. Judge Flores's Meeting with the Jury

On appeal, Huerta notes that although the State filed a motion for JNOV, the trial court's reasoning for granting the motion was not based upon the State's arguments in its motion for JNOV. Instead, Huerta asserts, the record demonstrates that the trial court improperly granted the JNOV based upon the trial judge's own informal post-trial conversations, held off the record and in the absence of counsel, with some of the jurors.[20] The State does not dispute that this occurred. However, the record does not contain any evidence of misconduct on the part of the trial court. In addition, Huerta does not provide relevant authority to support his bald allegations. As such, we will not address this contention, as it has been inadequately briefed. *See* TEX. R. APP. P. 38.1(h). We must now determine whether the currency seized constituted contraband subject to seizure by law enforcement.

## B. Currency and Contraband

---

[20] It appears that Huerta bases this contention solely on the fact that he received an unfavorable ruling. However, "[j]udicial rulings alone almost never constitute a valid basis for a bias or partiality motion." *See Liteky v. United States*, 510 U.S. 540, 555 (1994); *see also Drake v. Spriggs*, No. 13-03-00429-CV, 2006 Tex. App. LEXIS 10657, at *15 (Tex. App.–Corpus Christi Dec. 14, 2006, no pet.).

"Property that is contraband is subject to seizure and forfeiture . . . ." TEX. CODE CRIM. PROC. ANN. art. 59.02(a). Forfeiture is an in rem civil proceeding. *State v. Silver Chevrolet Pickup*, 140 S.W.3d 691, 692 (Tex. 2004); *$191,452.00 v. State*, 827 S.W.2d 430, 433 (Tex. App.–Corpus Christi 1992, writ denied). In a forfeiture proceeding, the State must prove by a preponderance of the evidence that the property seized is contraband and, therefore, that the property is subject to forfeiture. *See* TEX. CODE CRIM. PROC. Ann. art. 59.02(a) (Vernon 2006); *see also 1.70 Acres v. State*, 935 S.W.2d 480, 486 (Tex. App.–Beaumont 1996, no writ); *$162,950.00 in Currency of U.S. v. State*, 911 S.W.2d 528, 529 (Tex. App.–Eastland 1995, writ denied). "Contraband" is defined as property of any nature, including real, personal, tangible, or intangible property that is used or intended to be used in the commission of any felony under the Texas Controlled Substances Act. *See* TEX. CODE CRIM. PROC. ANN. art. 59.01(2)(B)(i).

The State is required in a forfeiture proceeding to show probable cause for seizing the property. *$56,700 in U.S. Currency v. State*, 730 S.W.2d 659, 661 (Tex. 1987); *$9,050.00 in U.S. Currency v. State*, 874 S.W.2d 158, 161 (Tex. App.–Houston [14th Dist.] 1994, writ denied). This means that the State must establish a substantial connection or nexus between the seized currency and the defined criminal activity. *1.70 Acres*, 935 S.W.2d at 486 (citing *$56,700 v. State*, 730 S.W.2d at 661; *$9,050 v. State*, 874 S.W.2d at 161). Therefore, in proving its case by a preponderance of the evidence, the State must prove that it was more reasonably probable than not that the seized currency was either intended for use in, or derived from, a violation of the offenses enumerated in the forfeiture

18

statute.[21] *Id.* Moreover, when relying on circumstantial evidence in forfeiture cases, the State is required to offer proof which does more than raise a mere surmise or suspicion regarding the source of the currency. *$11,014.00 v. State*, 828 S.W.2d 814, 816 (Tex. App.–Houston [1st Dist.] 1992, no writ) (op. on remand) (noting, "[m]oney is subject to forfeiture if it is derived from or intended for use in manufacturing, delivering, selling, or possessing a controlled substance."); *Antrim v. State*, 868 S.W.2d 809, 812 (Tex. App.–Austin 1993, no writ). In other words, the State must present sufficient circumstantial evidence to meet its burden by a preponderance of the evidence. *Spurs v. State*, 850 S.W.2d 611, 614 (Tex. App.–Tyler 1993, writ denied).

There is no direct evidence that the $281,420.00 taken from the Freightliner towed by Huerta was derived from or intended for use in manufacturing, delivering, selling, or possessing a controlled substance. *See Henderson v. State*, 669 S.W.2d 385, 387 (Tex. App.–San Antonio 1984, no writ) (no direct evidence established currency was derived from the sale of methamphetamines when officer admitted he did not see any exchange of narcotics, nor were any narcotics found with the currency).[22] Trooper Torres admitted

---

[21] As previously mentioned, the State, in its third amended petition, asserted that the currency was contraband as defined by article 59.01(2)(A) and (2)(B) of the Texas Code of Criminal Procedure and thus subject to seizure and forfeiture pursuant to article 59.02(a). *See* TEX. CODE CRIM. PROC. ANN. arts. 59.01(2)(A),(B), 59.02(a) (Vernon 2006). The State further asserted that "the seizure of the currency was made pursuant to a lawful arrest, lawful search, or lawful search incident to arrest." *Id.* art. 59.03(b)(4) (Vernon 2006). The State asked the trial court to (1) find that the currency constituted contraband, (2) allow forfeiture of the currency pursuant to article 59.05(e), *see id.* art. 59.05(e) (Vernon 2006), and, (3) allow that the currency be disposed of pursuant to article 59.06, *see id.* art. 59.06 (Vernon 2006).

[22] Some Texas courts have reviewed at least five factors in assessing the evidence in a forfeiture case: (1) the proximity of the money to the drugs and to evidence of drug trafficking; (2) evidence that the money was previously in contact with drugs, usually determined by a canine alert; (3) suspicious activity consistent with drug trafficking; (4) the amount of money at issue; and (5) expert testimony that there was probable cause to seize the property subject to forfeiture (i.e. a substantial connection exists between the property to be forfeited and the criminal activity). *$7,058.84 in U.S. Currency v. State*, 30 S.W.3d 580, 586-87 (Tex. App.–Texarkana 2000, no pet.) (citing *Antrim v. State*, 868 S.W.2d 809, 814 (Tex. App.–Austin 1993, no writ)). However, none of the aforementioned factors, by themselves, are dispositive. *See id.*

that Huerta was never under arrest at any time during any investigations. The only crime Huerta committed was speeding, and that crime was committed in cooperation with the State. Based on Trooper Torres's testimony, Huerta was neither in possession of nor was attempting to buy or sell any narcotics. In addition, while at U.S. Customs in Hidalgo, drug-sniffing dogs conducted a search of the Freightliner for any signs of narcotics and U.S. Customs officers x-rayed the Freightliner to search for hidden compartments in the Freightliner and for narcotics. Both searches yielded negative results pertaining to the existence of narcotics. The evidence in the record does not support a finding that the currency found in the Freightliner towed by Huerta was derived from the sale of narcotics or any other criminal activity.

Throughout the trial, the State attempted to characterize the currency seized as contraband. However, the evidence suggests that the currency was not contraband within the context of the forfeiture statute. *See* TEX. CODE CRIM. PROC. ANN. art. 59.01(2)(B)(i). Moreover, the jury concluded, in its answer to question one of the trial court's jury charge, that the currency made the basis of this lawsuit was not contraband.[23] The State has only raised a surmise or a mere suspicion as to the origins of the currency seized. *See Antrim*, 868 S.W.2d at 812; *Spurs*, 850 S.W.2d at 614; *$11,014.00 v. State*, 828 S.W.2d at 816. In fact, the State has failed to establish (1) that a crime involving a controlled substance occurred or was intended, and (2) a nexus between such a crime and the currency seized. *See 1.70 Acres*, 935 S.W.2d at 486. In viewing the evidence in a light favorable to the

---

[23] Specifically, in question one of the jury charge, the jury was asked "Do you find by a preponderance of the evidence that the currency made the basis of the lawsuit is "Contraband"?" The charge explained that "[c]ontraband means the proceeds gained from the commission of a felony under Chapter 481, Health and Safety Code (Texas Controlled Substances Act), a felony under Chapter 483 Health and Safety Code." The jury returned a finding that the currency was not contraband.

verdict, we find that the currency seized was not contraband within the ambit of the forfeiture statute.  *See* TEX. CODE CRIM. PROC. ANN. art. 59.01(2)(B)(i), art. 59.02(a)*; see also Williams*, 137 S.W.3d at 124.  Because we have found that there is more than a scintilla of competent evidence to support the jury's finding, the JNOV should be reversed. *See Mancorp, Inc.*, 802 S.W.2d at 228.  We therefore sustain Huerta's second issue.  As a result, we must reinstate the jury's findings and review them accordingly.  *See id*; *see also Escoto*, 200 S.W.3d at 733.

## IV. HUERTA'S MOTION TO DISREGARD THE JURY'S ANSWERS

By his third issue, Huerta argues that the trial court erred in denying his motion to disregard the jury's answers to question three of the jury charge and for a verdict of $281,420.00.  In support of this contention, Huerta asserts that because the currency is not contraband and because he was the last person in possession of the currency prior to seizure, he is entitled, as bailee, to the currency under "the principle of 'finders keepers.'" Conversely, the State alleges that Huerta's motion to disregard was unsupported by factual or legal support and that this was an attempt by Huerta to completely change the verdict rendered by the jury.  As such, the State contends that the trial court properly denied Huerta's motion to disregard.

A trial court may disregard a jury's answer to a question in the charge only when the answer has no support in evidence or the question is immaterial.  *River Oaks Place Council of Co-Owners v. Daly*, 172 S.W.3d 314, 321 (Tex. App.–Corpus Christi 2005, no pet.) (citing *Zapalac v. Cain*, 39 S.W.3d 414, 417 (Tex. App.–Houston [1st Dist.] 2001, no pet.)).  In determining whether "the answer has no support in evidence," we must review the record in the light most favorable to the finding, considering only the evidence and

21

inferences that support the finding and rejecting the evidence and inferences contrary to the finding. *Id.* (citing *Tex. Animal Health Comm'n v. Garza*, 27 S.W.3d 54, 62 (Tex. App.–San Antonio 2000, pet. denied)). If more than a scintilla of competent evidence supports the jury's finding, then the trial court's decision is reversed and the finding is reinstated. *Garza*, 27 S.W.3d at 62. A question is immaterial when it should not have been submitted, or when it was properly submitted but has been rendered immaterial by other findings. *Spencer v. Eagle Star Ins. Co. of Am.*, 876 S.W.2d 154, 157 (Tex. 1994).

Question three of the jury charge asked "What amount of money should be awarded to the Intervenor [Huerta] (Write in a figure between $0.00 and $281,420.00)." The jury returned a finding that Huerta was entitled to $70,000. However, in examining question three of the jury charge, we must also review the previous two questions asked of the jury. In question one of the jury charge, the jury was asked "Do you find by a preponderance of the evidence that the currency made the basis of the lawsuit is "Contraband"?" In response, the jury returned a finding that the currency was not contraband. The second question of the jury charge asked the jury "Do you find by a preponderance of the evidence that the Intervenor [Huerta] was in actual or joint possession of the currency at the time of seizure." The charge defined "possession" as "actual care, custody, control, or management." The charge further explained that "actual possession means physical occupancy or control over property" and that "joint possession means possession shared by two or more persons." In response to question two of the jury charge, the jury found that Huerta was in actual or joint possession of the currency at the time of seizure.

In response to the jury's findings, Huerta filed a motion to disregard the jury's finding pursuant to question three, arguing that it was rendered immaterial by the jury's findings

22

in questions one and two. Furthermore, Huerta asserted that the State's third amended petition failed to state grounds for forfeiture of the currency if the currency is not found to be contraband.[24] We agree.

In concluding that the currency was not contraband, the jury implicitly found that the State failed to meet its burden in establishing a nexus between the seized currency and any criminal activity referenced in the forfeiture statute. *See 1.70 Acres*, 935 S.W.2d at 486. As such, the currency was not contraband subject to seizure and forfeiture under the Code of Criminal Procedure. *See* TEX. CODE CRIM. PROC. ANN. art. 59.01(2)(B)(i), art. 59.02(a). Furthermore, the jury, after hearing all the evidence, determined that Huerta was in actual or joint possession of the currency at the time of seizure, thus entitling him to the currency. The record reflects that Huerta, the bailee in possession of the Freightliner where the currency was found, was the individual who found the currency. The record further reflects that Huerta gave consent to DPS and U.S. Customs officers to search the Freightliner and its contents on two occasions, thereby supporting the jury's finding that Huerta was in possession of the currency at the time of seizure. Accordingly, we find that more than a scintilla of competent evidence supports the jury's conclusion that Huerta was in possession of the Freightliner and the currency at the time of seizure. *Best*, 786 S.W.2d at 671; *Mancorp, Inc.*, 802 S.W.2d at 228; *Williams*, 137 S.W.3d at 124. Because the jury found that the currency was not contraband and that Huerta was in possession of the Freightliner and currency at the time of seizure, question three of the jury charge was immaterial. *See* TEX. CODE CRIM. PROC. ANN. art. 59.01(2)(B)(i), art. 59.02(a); *Spencer*,

---

[24] In reviewing all of the pleadings filed, the State's seizure of the currency at issue is entirely premised on a finding that the currency is, indeed, contraband.

876 S.W.2d at 157. Therefore, Huerta is entitled to the full amount seized from the Freightliner. *See* TEX. CODE CRIM. PROC. ANN. art. 59.01(2)(B)(i), art. 59.02(a). Accordingly, we sustain Huerta's third issue.

## V. RESPONSE TO THE DISSENT

The dissent's position inaccurately characterizes Texas case law pertaining to civil forfeitures and contraband. Essentially, the dissent concludes that, in the present case, the currency seized was contraband based solely on the large amount of money seized and the fact that the currency was found in "twenty to thirty little bundles wrapped in duct tape."

### a. Huerta's Entitlement to the Seized Currency

The dissent first takes issue with the fact that the jury charge did not contain a question pertaining to Huerta's possessory interest in the Freightliner and its contents. Specifically, the dissent complains that the jury was not asked whether Huerta was either in possession of the Freightliner at the time of seizure or whether he was a bailee at the time of seizure. However, the apparent failure of either party to submit these questions does not alter our conclusion. Huerta was not required to submit a question about his possessory interest in the Freightliner because the evidence demonstrated that he had abandoned his claim to the Freightliner earlier in the suit. Furthermore, Huerta did not need to submit a question as to his status as a bailee because Pulido, the owner of the Freightliner, abandoned his right to the currency after being called repeatedly by Huerta and by the default judgment taken against him.

The dissent asserts that because Huerta did not submit the aforementioned questions to the jury, the State is entitled to the currency by default. However, the

24

dissent's logic is incorrect in that it relieves the State's burden to prove that the currency is contraband and therefore subject to forfeiture and, instead, shifts the burden to Huerta to prove that the currency is not contraband, not subject to forfeiture, and that he has a right to the currency.

The dissent also argues that Pulido did not relinquish his ownership rights prior to seizure. While this would be important if the State had been authorized to seize the currency, it is immaterial in this case because the State did not have a possessory interest and because the jury concluded that Huerta did have a possessory interest in the currency.[25] As previously mentioned, the record reflects that Pulido abandoned his ownership rights in both the Freightliner and its contents.[26] What we are left with is a situation where (1) the State was not authorized in seizing the currency, (2) Pulido had abandoned the property, and (3) the jury had concluded that Huerta was the last individual in possession of the currency before the State improperly seized the currency. Therefore, we must decide whether the State or Huerta has a greater possessory interest in the

---

[25] As accurately recited in the majority opinion and in the dissent, the jury answered in the affirmative to the second question of the jury charge which asked whether Huerta was in actual or joint possession of the currency at the time of seizure. Clearly, the jury believed that Huerta, and not Pulido, had a possessory interest in the currency.

[26] Under Texas law, abandonment is generally a fact question and the facts must affirmatively demonstrate an intent to abandon. *Russell v. Am. Real Estate Corp.*, 89 S.W.3d 204, 205 n.5 (Tex. App.–Corpus Christi 2002, no pet.). Specifically, abandonment means "to give up absolutely; to forsake entirely; to renounce utterly; to relinquish all connection with or concern in; to desert." *R.R. Comm'n of Tex. v. Waste Mgmt. of Tex., Inc.*, 880 S.W.2d 835, 843 (Tex. App.–Austin 1994, no writ) (noting that "when applied to personal property we think the term [abandonment] also includes intent by the owner to leave the property free to be appropriated by any other person.") (citing BLACK'S LAW DICTIONARY 2 (6th ed. 1990); *City of Anson v. Arnett*, 250 S.W.2d 450, 454 (Tex. Civ. App.–Eastland 1952, writ ref'd n.r.e.); *see Sharpe v. Turley*, 191 S.W.3d 362, 367-68 (Tex. App.–Dallas 2006, pet. denied). In the present case, the trial court entered a default judgment against Pulido, indicating that Pulido had abandoned the Freightliner and the currency.

25

currency.[27]

In the present case, the State failed to establish that (1) the currency was derived from any wrongdoing, i.e. contraband, and (2) it had a possessory interest in the currency. As a result, the State is not entitled to receive the currency pursuant to the forfeiture statutes. Therefore, we are left with but one person who had a possessory right in the currency and who did not abandon his claim—Huerta.

**b. The Currency as Contraband**

The dissent relies on several Texas appellate court cases—which are factually distinguishable from the present case—in concluding that the currency at issue here was contraband as a matter of law and therefore subject to forfeiture. In each of the cited cases, the State presented substantially more evidence linking the currency to drugs than the State did in the present case.

In *Antrim*, the trial court concluded that "there was a substantial connection between the cash and the criminal activity defined by the Controlled Substances Act" based on the following evidence: (1) the occupants of the vehicle, Antrim and August Mauer, gave conflicting statements regarding their destination after State Trooper Lee Richards stopped them for failing to wear a seatbelt; (2) after obtaining consent, Trooper Richards found a cardboard box, which smelled of marihuana, containing $301,391 in cash; and (3) the box contained marihuana residue. 868 S.W.2d at 811-12.

In *Money of the United States $8,500.00 v. State*, the following evidence was

---

[27] The dissent notes that there is no legal basis for Huerta to recover. However, the dissent has failed to provide a legal basis denying Huerta's recovery of the currency. We are therefore left to consider the specific facts of the case to determine who has a greater possessory interest in the currency—the State or Huerta.

26

adduced at trial: (1) appellant, Arlie Golish, met several times with undercover narcotics officers to buy at least fifty pounds of marihuana; (2) on October 12, 1985, Golish, Kurt Olsen, a buyer from Minnesota, and undercover narcotics officers met in a Safeway parking lot to complete the transaction for fifty pounds of marihuana; (3) the State seized $20,202 from Golish that was to be used to buy the marihuana, Golish's Corvette, an additional $8,500 from Golish, $11,000 from the Corvette allegedly belonging to Olsen, and an additional $697 found on Olsen. 774 S.W.2d 788, 789 (Tex. App.–Houston [14th Dist.] 1989, no writ). The court concluded that the foregoing evidence was sufficient to establish that the seized currency was derived from the sale, manufacture, distribution, dispensation, delivery, or other commercial undertaking violative of the Controlled Substances Act and was therefore subject to forfeiture. *Id.* at 790.

The dissent also relies on the holding in *State v. $11,014.00* in arriving at its conclusion that the currency seized was contraband. 820 S.W.2d 783, 784-85 (Tex. 1991). In *State v. $11,014.00*, the court concluded that the currency seized was subject to forfeiture based on, among other things: (1) a large bundle of cash wrapped in sheets and secured by a rubber band; (2) the testimony of a Houston narcotics officer that the appellee, Wilks, was unable to produce proper immigration papers and that the flight from New York City to Houston was frequented by people transporting drugs and drug money; and (3) a positive alert from a canine search of the suitcase and the money contained inside established that the suitcase and the money had been in contact with a controlled substance and was, therefore, contraband. *Id.*

In *$18,800 in U.S. Currency v. State*, the trial court concluded that the currency seized was subject to forfeiture based upon the State's evidence that police found a kilo

of cocaine in appellant Guzman's waist band and $18,800 in a duffel bag in the rear of Guzman's Nissan. 961 S.W.2d 257, 259 (Tex. App.–Houston [1st Dist.] 1997, no writ). Moreover, in *$162,950 in Currency of the United States v. State*, the court held that the currency found was substantially connected to a felony under section 34.02 of the Texas Penal Code or chapter 481 of the Health and Safety Code and, therefore was subject to forfeiture, based on the following evidence: (1) upon stopping appellant's vehicle for illegal window tinting, a DPS Trooper smelled marihuana and air freshener from the car; (2) the appellant gave conflicting statements as to his destination and appeared nervous; (3) after a consent search, the DPS Trooper found two packages of money, one wrapped in a Kentucky Fried Chicken bag with clear plastic tape and the other was a box taped shut; (4) the bag was torn and the money was visible; (5) the DPS Trooper seized $162,100 in the bag and $850 appellant had in his pockets; and (6) although no drugs or drug paraphernalia were found on appellant or in his vehicle, the DPS Trooper's drug dog "alerted on the trunk, both car doors, and on both packages of money," thus establishing that appellant and the money were in contact with a controlled substance at some point in time. 911 S.W.2d at 531.

Clearly, in the aforementioned cases, the State presented substantially more evidence than what was presented in the present case, which allowed the court to conclude that the forfeiture was supported by legally sufficient evidence. Here, the State relied solely on the amount of money seized and the fact that the money was wrapped in twenty to thirty little bundles with duct tape to establish that the currency was contraband. Various x-ray examinations and canine searches were conducted by U.S. Customs agents on the currency itself and the Freightliner, all of which failed to indicate the presence of

28

drugs. Furthermore, no testimony was adduced at trial that the Freightliner or the currency smelled of drugs or ever were in contact with any controlled substances. The State failed to adduce additional evidence to establish the nexus between the currency and a violation of the Controlled Substances Act.

Alternatively, the dissent relies on the fact that a large sum of money was found and that it was wrapped in small bundles in duct tape.[28] However, this evidence alone does not raise more than a mere surmise or suspicion that the currency originated from a felony "under Chapter 481 (Texas Controlled Substances Act) and/or Chapter 483, Health and Safety Code." *See Antrim*, 868 S.W.2d at 812. Therefore, there is not legally sufficient evidence to support the State's contention that the currency seized was contraband.[29] Because the State failed to establish that the currency seized was contraband, the State had no possessory right to the currency. As such, we cannot subscribe to the dissent's

---

[28] The dissent misconstrues this Court's holding in *$24,180.00 v. State*, 865 S.W.2d 181, 184 (Tex. App.–Corpus Christi 1993, writ denied) when it notes that "evidence that money wrapped in small bundles signifies it was used in a drug deal." *$281,420 v. State*, 2008 Tex. App. LEXIS __, at __. In *$24,180 v. State*, this Court did not hold that money wrapped in small bundles conclusively establishes that the money was used in a drug deal. *See* 865 S.W.2d at 181. Instead, this Court concluded that the money was used to further the delivery of marihuana when considering not only the wrapping of the money, but also evidence adduced at trial from undercover police officers of the Drug Task Force for Hidalgo County that the appellant agreed to purchase sixty pounds of marihuana for $600 a pound from the officers. *Id.* at 186. This Court specifically noted that:

> The currency seized in this instance, $24,180, would certainly further a $36,000 purchase ($600 x 60 lbs.). In spite of the undercover officer's testimony on direct that Weeks [first appellant] attempted to "rip [him] off," the undercover officer testified on cross-examination that he agreed with Mendoza [second appellant] to have a subsequent meeting with him and Weeks in which he would receive the remainder of the purchase price. This constitutes evidence that the $24,180 was in fact only intended to further the commission of delivery of the sixty pounds of marihuana.

*Id.*

[29] The dissent also tries to improperly shift the burden to Huerta to prove the origin of the currency. *$281,420 v. State*, 2008 Tex. App. LEXIS __, at __ ("Moreover, Huerta presented no evidence concerning the origin of the currency.") (Vela, J., dissenting). It is the State who is required to establish the origin of the currency in proving that the currency was derived from or intended for use in manufacturing, delivering, selling, or possessing a controlled substance. *See Antrim*, 868 S.W.2d at 812.

rationale for awarding the currency to the State.

## VI. CONCLUSION

Because we have sustained Huerta's second and third issues on appeal, we need not address his fourth issue. *See* TEX. R. APP. P. 47.1. Accordingly, we reverse the trial court's JNOV and the jury's finding as to question three and render judgment for the full amount of currency seized in favor of Huerta.

_____
DORI CONTRERAS GARZA,
Justice

Dissenting Memorandum Opinion
by Justice Rose Vela.

Memorandum Opinion delivered and
filed this the 3rd day of April, 2008.

30