The STATE of Texas, Petitioner,

v.

$281,420.00 IN UNITED STATES
CURRENCY, Respondent.

No. 08–0465.

Supreme Court of Texas.

Argued Oct. 7, 2009.

Decided May 14, 2010.

Rene Guerra, Criminal District Attorney, Timothy Audrey Davis, Hidalgo Co. Crim. Asst. Dist. Atty., Edinburg, for Petitioner.

Edward A. Mallett, Mallett & Saper, L.L.P., Houston, for Respondent.

James C. Ho, Solicitor General of Texas, Sean D. Jordan, Assistant Solicitor General, Austin, for Office of the Solicitor General of Texas.

Justice O'NEILL delivered the opinion of the Court.

Law enforcement officers seized a truck while it was being towed and discovered a large amount of cash hidden in the axle. In this forfeiture proceeding that followed, neither the truck's owner nor the person who arranged the tow came forward to assert an interest in the currency. The tow-truck driver, however, intervened in the suit and claimed the currency as the last person in possession. Upon determining that the State had failed to meet its burden to establish that the currency was contraband, a divided court of appeals awarded the cash to the tow-truck driver. Because we hold that the driver has not established a valid legal claim to the currency, we reverse the court of appeals' judgment and remand to the trial court for further proceedings.

## I. Background

Johnny Mercado approached Gregorio Huerta, the owner of Greg's Towing, at a race track in Edinburg, Texas, and asked Huerta to tow a disabled Freightliner truck-tractor from Alvin to Mercedes for approximately $2,800. Huerta agreed, drove to Alvin that night to retrieve the truck, and returned to his office in Edinburg. Huerta contacted Mercado to request payment, and they planned for Huerta to follow Mercado with the truck to the final destination in Mercedes. When Mercado did not show up, Huerta became worried that the truck might be stolen and contacted Department of Public Safety Trooper Cesar Torres. Torres agreed to stop by Huerta's office to inspect the truck, but before he got there Mercado arrived and paid for the tow. Huerta informed Torres that it would no longer be necessary for him to come by, but Torres still had concerns about the truck and insisted on inspecting it. Together they devised a plan whereby Huerta would intentionally exceed the speed limit so that Torres would have probable cause to pull him over. When Torres stopped Huerta for speeding in San Juan, Mercado circled the area several times and then drove away.

Huerta gave Torres verbal and written permission to perform a road-side search of the truck cab. Unable to find anything during the field search, Torres asked Huerta to move the truck to the United States Customs point of entry at the International Bridge in Hidalgo for further inspection. There law enforcement officers examined the truck, x-rayed it, and searched it with drug sniffing dogs, but nothing was discovered. At some point, officers examined the center axle of the truck and, with Huerta's assistance, removed the housing around one of the ax-

les. Inside the housing were a number of tightly-wrapped bundles containing $281,420 in United States currency.

The vehicle identification number and license plates established that Jesus Pulido is the truck's registered owner. Huerta contacted Mercado and left voice messages about the truck and the currency, but Mercado never responded to his inquiries. Torres told Huerta that if no one came forward to claim the money Huerta should get some sort of reward. When no one came forward, Huerta contacted Torres about a reward but was told he would have to speak to Torres's superiors. Huerta did not receive a reward for his role in the seizure.

The Hidalgo County District Attorney's Office commenced separate forfeiture proceedings against the truck and the currency pursuant to Chapter 59 of the Code of Criminal Procedure. Mercado and Pulido were served with citation, but neither answered or appeared in the suit. An attorney ad litem was appointed to represent Pulido's interest as the truck's registered owner. Approximately one month after the State initiated the proceedings, Huerta filed a petition seeking to intervene as the last person in possession of the currency at the time it was seized. According to Huerta, the currency was not contraband, Mercado and Pulido had abandoned any claims they held to the currency by failing to answer or appear, and Huerta's interest in the currency was superior to that of the State.

The jury found that the currency was not contraband, that Huerta was in actual or joint possession of the currency at the time of seizure,[1] and that Huerta should be awarded $70,000 (roughly 25%) of the currency found in the hub housing. The State moved for judgment notwithstanding the verdict claiming the money was contraband under Chapter 59 of the Code of Criminal Procedure and that Huerta did not have a valid legal claim to the currency. The trial court agreed, found the currency to be contraband, and ordered its forfeiture to the Hidalgo County Criminal District Attorney and DPS.

A divided court of appeals reversed the trial court's judgment, holding that the currency had not been shown to be contraband and that Huerta was entitled to the entire $281,420. 312 S.W.3d 586. The State no longer contests the court of appeals' determination that the currency was not contraband, leaving us to decide whether Huerta established his entitlement to the currency. We conclude that he did not.

## II. Discussion

The Texas Code of Criminal Procedure provides the mechanism for determining whether property deemed contraband that is seized by the State is subject to forfeiture. *See* TEX.CODE CRIM. PROC. art. 59.01–.14. Contraband includes "property of any nature" that is used, or, for certain felonies, intended to be used, in the commission of one or more of the enumerated crimes in article 59.01(2) of the Code of Criminal Procedure. *Id.* art. 59.01(2). Contraband also includes proceeds gained from the commission of certain crimes, property acquired as a result of the commission of certain crimes, and property

---

1. Question 2 of the jury charge asked whether, "by the preponderance of the evidence . . . intervenor was in actual or joint possession of the currency at the time of seizure[.]" The charge defined "possession" as "actual care, custody, control, or management." It defined "actual possession" as "physical occupancy or control over property." Finally, it defined "joint possession" as "possession shared by two or more persons." The State did not object to the charge at trial.

used to facilitate the commission of certain crimes. *Id.* art. 59.01(2)(c), (D), & (E). Property that is determined to be contraband is subject to seizure by the State. *Id.* art. 59.02(a). A seizure of contraband may be made without a warrant if "the seizure is incident to a search to which the owner, operator, or agent in charge of the property knowingly consents." *Id.* art. 59.02(b)(2). Once the property has been seized, the State has thirty days to commence a forfeiture proceeding. *Id.* art. 59.04(a).

The State must serve notice of the forfeiture proceeding on "the owner of the property" and "any interest holder in the property." *Id.* art. 59.04(b)(1)-(2). The owner of the property is one "who claims an equitable or legal ownership interest in the property." *Id.* art. 59.01(6). An interest holder is one who is a "bona fide holder of a perfected lien or a perfected security interest in the property." *Id.* art. 59.01(4). The officer who seizes the property has custody of the property. *Id.* art. 59.03(c). Further, the "person who was in possession of the property at the time it was seized shall be made a party to the proceeding." *Id.* art. 59.04(j). Huerta was not made a party to the currency-forfeiture proceeding by the State. Instead, he intervened in the suit on the ground that he had an interest in the currency as the person in possession of it at the time it was seized. *See id.* Specifically, Huerta claims he is entitled to the currency because his possessory interest is superior to that of the State.

When the State fails to meet its burden to prove that seized property is contraband under Chapter 59, it no longer has the authority to retain the property under that provision. In such a case, the State will usually assert no possessory interest and return the property to the person from whom it was seized. Here, however, the State contests Huerta's legal entitlement to the property. Huerta asserts two theories to support his claim. First, he argues that he is entitled to the currency as a bailee because the property was abandoned while in his possession. Alternatively, he argues that he is entitled to possession as the finder of the currency.

### A. Bailment/Abandonment

■ Huerta first asserts that, as bailee of the Freightliner, he is entitled to the currency because it was abandoned by Mercado while in Huerta's possession. This argument, however, presumes that Huerta established a bailment as to the currency, something Huerta did not do. To create a bailment, there must be (1) delivery of personal property from one person, the bailor, to another, the bailee, for a specific purpose; (2) acceptance of delivery by the bailee; (3) an express or implied contract between the parties that the specific purpose will be realized; and (4) an agreement between the parties that the property will be either returned to the bailor or dealt with according to the bailor's direction. *See Cessna Aircraft Co. v. Aircraft Network, LLC,* 213 S.W.3d 455, 462–63 (Tex.App.-Dallas 2006, pet. denied); *see also Int'l Freight Forwarding, Inc. v. Am. Flange,* 993 S.W.2d 262, 263 (Tex. App.-San Antonio 1999, no pet.). That a bailment may have existed concerning the Freightliner does not mean that a bailment existed as to the currency. The bailee must, at a minimum, *"knowingly* [take the] property into possession or control" for there to be a bailment. *See Russell v. Am. Real Estate Corp.,* 89 S.W.3d 204, 211 (Tex.App.-Corpus Christi 2002, no pet.) (emphasis added) (citing *Rust v. Shamrock Oil & Gas Corp.,* 228 S.W.2d 934, 935 (Tex.Civ.App.-Amarillo 1950, no writ)). Huerta admitted at trial that he did not enter into an agreement with Mercado to transport the currency and that he was not

aware of the currency before it was discovered in the axle. A bailee's duty of care extends to undisclosed items in a vehicle that are in plain view. *See Jack Boles Servs., Inc. v. Stavely*, 906 S.W.2d 185, 190 (Tex.App.-Austin 1995, writ denied). But if the undisclosed items are not in plain view, then the bailee's duty of care extends to items that are "reasonably anticipated to be found in the car based on the surrounding circumstances." *Id.* (holding that the bailee's duty of care did not extend to an undisclosed piece of valuable artwork stored in trunk of valeted vehicle); *see also Ampco Auto Parks, Inc. v. Williams*, 517 S.W.2d 401, 403–05 (Tex. Civ.App.-Dallas 1974, writ ref'd n.r.e.) (holding that parking lot attendant company could not have reasonably foreseen that vehicle's trunk would be full of valuable artifacts). Although it is true, as Huerta notes, that *Stavely* and *Ampco* concerned a bailee's liability for undisclosed items of value stored in an automobile, in each case whether a bailment existed as to the undisclosed items—and thus whether the bailee could be held liable for their theft—was necessarily dependent upon establishment of a bailment contract. Thus, if undisclosed items are *not* in plain view and the bailee could not have reasonably anticipated that they would be in the vehicle, the bailment contract does not extend to those items. *Ampco* at 404–05. Huerta cannot claim possession of the currency as bailee without first establishing that there was a bailment as to the money. Because Huerta did not knowingly take possession of the cash when the truck was entrusted to him, no bailment was created with respect to the money.

■■ Although it is not entirely clear, Huerta appears to believe that, with or without a bailment, he may claim the cash because it was abandoned while in his possession. However, even if such a claim were viable, one who seeks to acquire abandoned property must take possession of the property with an intent to acquire title. *See Trenolone v. Cook Exploration Co.*, 166 S.W.3d 495, 500–01 (Tex.App.-Texarkana 2005, no pet.) Huerta contends he had possession of the currency before it was seized by law enforcement officers because he was the first to remove it from the axle and the first to discover that the bundles contained currency. We disagree. Huerta removed the hub housing while assisting law enforcement and customs officials. By the time the currency was discovered, Huerta had already turned the vehicle over to law enforcement, and it had been subjected to a roadside search, an x-ray, and a sniff search by dogs. The fact that Huerta was the first to remove the currency bundles from the axle does not establish that he was in legal possession of them. Moreover, Huerta never expressed an intent to acquire title to the currency; when Huerta inquired further about the money after it had been seized, he merely sought a reward for finding it, not the return of money that had been abandoned while in his possession. Huerta's theory of legal entitlement based upon simple abandonment is unavailing.

### B. Mislaid/Lost Property

■■ Huerta also claims a right to possession of the currency under a common law "treasure trove" or "finders keepers" doctrine. The treasure-trove doctrine applies to "[v]aluables found hidden in the ground or other private place, the owner of which is unknown." BLACK'S LAW DICTIONARY 1539 (8th ed. 2004); *see also Schley v. Couch*, 155 Tex. 195, 284 S.W.2d 333, 335 (1955) (stating that such valuables generally consist of "money or coin, gold, silver, plate, or bullion"). However, we have previously declined to recognize the treasure-trove doctrine as part of Texas law. *Schley*, 284 S.W.2d at 335. Instead, we

apply the common law distinctions of "lost" and "mislaid" property. *Id.* Accordingly, we examine Huerta's claim to the currency as either lost or mislaid property. *Id.*

■ Mislaid property includes "property which the owner intentionally places where he can again resort to it, and then forgets." *Id.* It is presumed that the owner or occupier of the premises on which the mislaid property is found has custody of the property. *Id.* The owner or occupier's possession of the property is superior to all except the true owner. *Id.* For example, in *Martin v. Johnson,* money that was found under a rug in a garage was found to be mislaid property. 365 S.W.2d 429, 430 (Tex.Civ.App.-Eastland 1963, no writ). As the owner of the premises on which the money was found, Johnson was determined to have a right to its possession as against an individual who claimed he had found the money, and as against the former occupants of the home. *Id.* In this case, by contrast, it is undisputed that Huerta did not own the "premises"—the Freightliner—on which the currency was found. Accordingly, Huerta cannot establish possession to the currency by characterizing it as mislaid property.

■ Neither can Huerta establish a right to possess the currency as lost property. In contrast to mislaid property, "lost" property includes "that which the owner has involuntarily parted with through neglect, carelessness or inadvertence." *Schley,* 284 S.W.2d at 335 (internal quotations and citation omitted). Unlike mislaid property, the owner or occupier of the premises on which lost property is found does not acquire title to the property. *Id.* Instead, the finder of lost property retains possession as against the owner of the premises on which the property is found, but not against the lost property's true owner. *Id.* In *Schley,* we held that money that

had been placed in a jar and then buried was not lost property. *Id.* at 336. The circumstances surrounding the money in *Schley* "repell[ed] the idea that it ha[d] been lost." *Id.* Where the owner does not part with property as a result of carelessness or neglect, but instead demonstrates "a deliberate, conscious and voluntary [desire] to hide his [property] in a place where he thought it was safe and secure, and with the intention of returning to claim it at some future date," it is mislaid property. *Id.* The property in this case—$281,420 in various denominations found in tightly-wrapped bundles in the axle of a truck—was clearly deliberately hidden. As in *Schley,* the manner in which the money was placed in the axle forecloses any argument that it was lost rather than mislaid.

### III. Disposition of Unclaimed Property Under Texas Code of Criminal Procedure Article 18.17

■ In his amicus curiae brief, the Solicitor General argues that property seized pursuant to Chapter 59 that is determined not to be contraband, but remains unclaimed, should be disposed of pursuant to Article 18.17 of the Code of Criminal Procedure. TEX.CODE CRIM. PROC. art. 18.17. Article 18.17 is intended to deal with the disposal of abandoned and unclaimed property. *Id.* That statute provides: "[property that] remain[s] unclaimed for a period of 30 days shall be delivered for disposition to a person designated by the municipality or the purchasing agent of the county in which the property was seized." *Id.* art. 18.17(a). Huerta asserts that because the State failed to elect Article 18.17 as a remedy during trial, it waived this argument. However, Article 18.17 is not a remedy but a procedure implemented by the Legislature to dispose of "[a]ll unclaimed or abandoned personal property of

every kind" that has been seized by the State and is not subject to the limited exceptions outlined in the statute. *Id.* Accordingly, the State is not foreclosed from seeking to dispose of the currency pursuant to Article 18.17, though we express no opinion on the subject.

### IV.  Conclusion

Because Huerta failed to establish a valid legal claim to possession of the currency, we reverse the judgment of the court of appeals awarding the money to him, and remand the case to the trial court for further proceedings consistent with this opinion.