**Affirmed and Opinion Filed November 14, 2014**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-13-00724-CV

**FLAGSTAR BANK, FSB, Appellant**
**V.**
**MARK WALKER, CONTEMPORARY TITLE SOLUTIONS, AND FIRST AMERICAN TITLE COMPANY Appellees**

**On Appeal from the 429th Judicial District Court**
**Collin County, Texas**
**Trial Court Cause No. 429-04864-2009**

## OPINION

Before Justices FitzGerald, Fillmore, and Stoddart
Opinion by Justice FitzGerald

This case arises out of the misappropriation of over eight million dollars in loan proceeds designated to fund a series of residential loan transactions. Following a jury trial, the trial court entered a take-nothing judgment against Flagstar Bank, FSB ("Flagstar") on its negligence claims against Mark Walker ("Walker"), Contemporary Title Solutions ("CTS") and First American Title Insurance Company ("First American"). On appeal, Flagstar asserts the trial court erred in granting a directed verdict on its fiduciary duty claim, abused its discretion in denying a spoliation instruction, and erred in denying summary judgment on its bailment claim. Flagstar also asserts that the judgment in favor of First American should be reversed because First American is vicariously liable for the conduct of CTS and Walker. In a cross-point, First American argues there is no vicarious liability. Walker and CTS also bring cross-points,

asserting that Flagstar lacks standing, and Flagstar is barred from recovery because the summary judgment evidence conclusively establishes their res judicata and judicial estoppel defenses. Finding no reversible error, we affirm the trial court's judgment.

## BACKGROUND

Flagstar is a federally chartered bank that issues warehouse lines of credit to mortgage banks (correspondents) which use the funds to make mortgage loans.[1] Flagstar also purchases about 70% of the loans it funds on the secondary market. One of Flagstar's warehouse borrowers was NDNJ, Inc. d/b/a/ Excel Funding ("Excel"). Excel had a twenty million dollar warehouse line of credit from Flagstar, and it was the lender for the $8.5 million in mortgage loans at issue here (the "Loans"). The relationship between Flagstar and Excel was governed by two agreements: a correspondent purchaser agreement (the "Purchaser Agreement") that described the circumstances under which Excel would sell Flagstar the mortgage loans it originated with its line of credit, and a warehouse and security agreement (the "Warehouse Agreement") by which Flagstar retained an interest in the loaned funds. The Purchaser Agreement required Excel to deliver loans secured by a valid first lien to Flagstar, and contains an irrevocable power of attorney giving Flagstar the authority to "exercise or perform any act, power or duty that Excel has or would have in connection with the mortgage loans purchased by Flagstar or which are reasonable to protect Flagstar's interest in the mortgaged property." Flagstar was required to purchase a loan if "in its sole discretion," that loan satisfied every "requirement set forth in the [Purchaser] Agreement" and "all policies, procedures and requirements of [Flagstar] made available to [Excel]," including the requirement that the loan be salable on the secondary market.

---

[1] A warehouse line of credit refers to a sum of money that large financial institutions set aside for the purpose of making loans to smaller financial institutions.

The Warehouse Agreement also allowed Flagstar to bring lawsuits arising from "any violation of the Closing/Disbursement instructions."

The purpose of the Loans was to fund forty mortgages on residential real property in Florida. These transactions were brought to Excel by an investment company, Loomis Wealth Solutions ("Loomis"). Loomis required that Lender Services Direct ("LSD") serve as escrow agent for all of the Loans. Although Flagstar had designated LSD as an "ineligible entity," LSD was named as the escrow agent for the transactions. Joseph Gekko ("Gekko") was the principal manager and shareholder of LSD.

LSD subcontracted the title work for the Loans to CTS. Walker is the President of CTS and the individual who signed the title commitments issued by CTS in connection with the Loans. CTS is a party to two agreements with First American, a title insurance underwriter.[2] Under the national agency agreement, First American appointed CTS its agent for purposes of issuing title commitments and policies in other states. The agency agreement specifies that CTS is not an agent of First American "for the transaction of escrow, closing, or tax deferred exchange business."

Between May and August 2008, Excel drew on its line of credit with Flagstar and originated the Loans for Loomis. As the escrow agent, LSD was required to disburse funds pursuant to Excel's closing instructions. At Excel's direction, Flagstar wired the proceeds of the loans directly to CTS. Excel issued the closing instructions for the Loans and provided these instructions to LSD. CTS also received instructions, but the parties dispute what those instructions entailed.

CTS contracted with the Stonewood Group to conduct title searches in the Florida real property records. After Flagstar wired the funds to CTS, CTS issued title commitments for the

---

[2] The agreements include a national agency agreement and a Texas agency agreement. The national agency agreement is at issue here.

Loans, naming Excel as the proposed insured, and wired the money to LSD. Prior liens on the properties were listed as exceptions rather than requirements on the title commitments, which allowed funds to be disbursed at closing without the prior liens being satisfied. When it sent the title commitments to LSD, CTS retained sufficient funds to cover the Stonewood Group's fee and the anticipated title premium to be earned.

After the transactions were thought to have closed, Flagstar, in reliance on the HUD-1 settlement statements, acquired the Loans from Excel and then securitized them and sold them to Fannie Mae on the secondary market. Flagstar admits that it received Excel's closing instructions to LSD before it agreed to purchase the loans and failed to confirm whether LSD was an eligible settlement agent.

After the loans were sold on the secondary market, it was discovered that the Loans had not closed. Although LSD received the money, the Loans were not funded. An attorney in Florida had a client who was involved in ten to twelve of the loans. He thought it peculiar that the transactions required LSD, a California company, be used to close the transactions instead of the local title company in which he held an interest. When the attorney discovered the fraud, he contacted the FBI, Flagstar, and Walker. During an investigation conducted by Flagstar, counsel contacted Gekko of LSD. Gekko acknowledged that he had the money, but he refused to release it. Flagstar subsequently attempted to attach LSD's bank accounts, but the accounts were empty. Gekko disappeared. Flagstar was required to repurchase the loans it sold to Fannie Mae.

Flagstar sued LSD, Gekko, CTS, Walker, and Excel in a California court. The California court determined that it had no jurisdiction over Walker. Flagstar subsequently nonsuited Walker and CTS and obtained a default judgment against LSD and Gekko for $27 million dollars. On January 15, 2010, Flagstar settled with Excel for approximately $900,000. On July 12, 2010, Excel executed a document entitled "Assignment of Claims," in which Excel assigned to Flagstar

–4–

all its right, title, and interest in and to any of Excel's claims against CTS, Walker, and First American.[3]

After the nonsuit of Walker and CTS in the California litigation, Flagstar initiated this action against CTS, Walker, and First American (collectively, appellees) and asserted the same causes of action it asserted against Excel in the California case. Flagstar appears to assert these claims as the assignee of Excel. The Fifth Amended Petition, the live pleading on which the case was tried, asserts claims against appellees for breach of contract/bailment, breach of fiduciary duty, and negligence. Prior to trial, the court granted summary judgment for Walker and CTS on several of Flagstar's claims, including bailment. Thus, the only remaining claims for trial were for breach of fiduciary duty and negligence against Walker and CTS and the alleged vicarious liability of First American.

At trial, before opening statements, the trial judge orally instructed the jury, without objection, that CTS and Walker are not escrow or closing agents and do not owe fiduciary duties of an escrow or closing agent. Instead, the court instructed that CTS and Walker's fiduciary duties to Flagstar "are of a title agent holding third party funds." Following the completion of the plaintiff's case-in-chief, the judge denied CTS's motion for directed verdict. But the judge subsequently invited CTS to re-urge the motion. When CTS did so, the trial judge concluded that no fiduciary duty existed, and granted a directed verdict in favor of Walker and CTS on the breach of fiduciary duty claim. Only the negligence claim was submitted to the jury.[4] The jury found that Flagstar was negligent and CTS and Walker were not negligent. The trial court then

---

[3] The Assignment provides, in pertinent part: Excel herby assigns to Flagstar all its right, title, and interest in and to any claims of any kinds whatsoever which Excel has or may have against Contemporary Solutions-USA, Inc. dba Contemporary Title Solutions, Mark Walker, First American Title Co., and/or First American Title Insurance Co.

[4] The charge described Flagstar as Flagstar individually and as the assignee of Excel's claims.

entered a take-nothing judgment against Flagstar. Flagstar's motion for new trial was overruled by operation of law.

## ANALYSIS

### *Standing*

In a cross-point, CTS asserts Flagstar has no standing because there is no relationship giving rise to a duty between the parties and Flagstar is not the injured party "whose primary legal right has been breached." According to CTS, Excel rather than Flagstar was the injured party. Consequently, CTS urges that we dismiss Flagstar's claims "to the extent Flagstar's judgment is not affirmed in its entirety."

Standing is a component of subject-matter jurisdiction.[5] A court has no jurisdiction over a claim made by a plaintiff who lacks standing to assert it.[6] Because standing is jurisdictional, it is not an issue we consider as an alternative to the merits. We begin our inquiry here.

A party must have both standing to sue and capacity to sue.[7] "The issue of standing focuses on whether a party has a sufficient relationship with the lawsuit so as to have a 'justiciable interest' in its outcome, whereas the issue of capacity 'is conceived of as a procedural issue dealing with the personal qualifications of a party to litigate.'"[8] "A plaintiff has standing when it is personally aggrieved, regardless of whether it is acting with legal authority; a party has capacity when it has the legal authority to act, regardless of whether it has a justiciable interest in the controversy."[9] A plaintiff with no legally cognizable interest in the outcome of the case lacks

---

[5] *Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 443–44 (Tex. 1993).

[6] *See Heckman v. Williamson Cnty.*, 369 S.W.3d 137, 150 (Tex. 2012).

[7] *Austin Nursing Ctr. v. Lovato*, 171 S.W.3d 845, 849 (Tex. 2005).

[8] *Id.* at 849.

[9] *Id.* at 848–49.

standing to sue on its own behalf, but may be authorized to sue on behalf of another.[10] When there is an assignment, the assignee stands in the shoes of the assignor and may assert those rights that the assignor could assert, including bringing suit.[11]

A plaintiff must affirmatively show, through pleadings and other evidence pertinent to the jurisdictional inquiry, a distinct interest in the asserted conflict, such that the defendant's actions have caused the plaintiff some particular injury.[12] Whether a plaintiff has standing is a legal question we determine de novo.[13]

CTS does not dispute or in any way challenge the validity of the assignment of claims from Excel to Flagstar, nor does it assert a lack of privity or other inability to recover on a contract.[14] The legal authority of Flagstar to proceed on Excel's assigned claims is not at issue. Instead, CTS argues that it does not owe a fiduciary duty to Flagstar, and because there is no duty, there is no standing. CTS's argument is flawed because it confuses the merits of a claim with a legally cognizable interest in the outcome.

Generally, if a court concludes there is no fiduciary duty as a matter of law, the remedy is not dismissal of the action for lack of standing.[15] Whether a claim has validity goes to the merits of the claim, not whether a party is entitled to assert it.

---

[10] *See Nootsie Ltd. v. Williamson Cnty. Appraisal Dist.*, 925 S.W.2d 659, 661 (Tex. 1996).

[11] *See Gulf Ins. Co. v. Burns Motors, Inc*., 22 S.W.3d 417, 420 (Tex. 2000).

[12] *Hunt v. Bass*, 664 S.W.2d 323, 324 (Tex. 1984); *see Cnty. of Cameron v. Brown*, 80 S.W.3d 549, 555 (Tex. 2002)

[13] *See Mayhew v. Town of Sunnyvale*, 964 S.W.2d 922, 928 (Tex. 1998).

[14] Such a challenge would be one of capacity, not standing. When the issue involves capacity arising from a contractual right, "Texas law is clear, and this court has previously held numerous times, that a challenge to a party's privity of contract is a challenge to capacity, not standing." *Transcontinental Realty Investors, Inc. v. Wicks*, No. 05-13-00362-CV, 2014 WL 3827901, at *2 (Tex. App.—Dallas, Aug. 5, 2014, no pet. h.). For example, in *National Health Resources Corp. v. TBF Financial, LLC*, 429 S.W.3d 125, 129 (Tex. App.—Dallas 2014, no pet.), this court concluded that whether a party was the assignee of a lease between the signatory parties was not an issue of standing, but whether the alleged assignee could recover in the capacity which it sued. *Id*. at 129. Moreover, there was no challenge to Flagstar's capacity in the court below. Therefore, any issue of capacity is waived. *See Nootsie*, 925 S.W.2d at 661.

[15] *See e.g., Doonan v. Wood*, 224 S.W.3d 271, 275 (Tex. App.—El Paso 2005, no pet.) (concluding summary judgment proper where there was no fiduciary duty); *Farah v. Mafrige & Kormanik, P.C*., 927 S.W. 2d 663, 666–67 (Tex. App.—Houston [1st Dist.] 1996, no writ (concluding summary judgment conclusively established no duty).

Flagstar premises its standing on an injury in its own right and on Excel's assignment of its claims. But Flagstar's breach of fiduciary claim was presented and tried based on an alleged duty owed from CTS to Flagstar. Therefore, we restrict our inquiry to whether Flagstar, acting in the capacity of Flagstar as opposed to as Excel's assignee, has a distinct interest in the asserted conflict.

The evidence reflects that Flagstar provided the funds for the Loans, and ultimately suffered a loss when it was required to repurchase the Loans from Sallie Mae. The fact that the funds were cycled through several channels before they were ultimately diverted is immaterial. Flagstar claims that the conduct of CTS in connection with those funds caused Flagstar to suffer injury. In addition, pursuant to the Warehouse Agreement, Flagstar retains an interest in the funds it provides for loans. The Warehouse Agreement also allows Flagstar to bring lawsuits arising from any violation of the closing instructions. Under these circumstances, we cannot conclude that Flagstar has not suffered an injury, or that it has no interest in the outcome. Because we conclude that Flagstar has standing, we have jurisdiction to consider its claims. CTS's cross-point is overruled.

### Fiduciary Duty

In its first two issues, Flagstar argues the trial court erred in granting a directed verdict against Flagstar on its breach of fiduciary duty claim because CTS and Walker owed Flagstar a fiduciary duty as a matter of law.[16]

A trial court may direct a verdict when a plaintiff fails to present evidence raising a fact issue essential to its right of recovery, or when the evidence conclusively proves a fact that

---

[16] CTS not only responds that there is no fiduciary duty as a matter of law, but also asserts that the jury's negligence findings render the directed verdict on fiduciary duty harmless error. CTS fails to explain any purported correlation between these two distinct causes of action, and we reject the argument.

establishes the movant's right to judgment as a matter of law.[17] In reviewing the grant of a directed verdict, we follow the standard of review for assessing legal sufficiency of the evidence.[18] We consider the evidence in the light most favorable to the party against whom the verdict is directed.[19] We must determine if there is any conflicting evidence of probative value that raises a material fact issue.[20]

A viable breach of fiduciary duty claim requires the following proof: (1) a fiduciary relationship between the plaintiff and defendant; (2) a breach of the fiduciary duty to the plaintiff; and (3) injury to the plaintiff (or benefit to the defendant) as a result of the breach.[21]

In certain formal relationships, such as an attorney-client or trustee relationship, a fiduciary duty arises as a matter of law.[22] Under certain specific circumstances, courts also recognize an informal fiduciary duty. An informal fiduciary duty "arises separate and apart from business relationships."[23] Informal fiduciary duties are not owed in business transactions unless the special relationship of trust and confidence existed prior to, and apart from, the transaction at issue in the case.[24] It is well settled that "not every relationship involving a high degree of trust and confidence rises to the stature of a fiduciary relationship."[25]

---

[17] *Prudential Ins. Co. of Am. v. Fin. Review Servs., Inc.*, 29 S.W.3d 74, 77 (Tex. 2000); *Keyes Helium Co. v. Regency Gas Servs., L.P.*, 393 S.W.3d 858, 864 (Tex. App.—Dallas 2012, no pet.).

[18] *S.V. v. R.V.*, 933 S.W.2d 1, 8 (Tex. 1996); *see generally City of Keller v. Wilson*, 168 S.W.3d 802 (Tex. 2005).

[19] *Tex. Emp'rs Ins. Ass'n v. Page*, 553 S.W.2d 98, 102 (Tex. 1977).

[20] *White v. Sw. Bell Tel. Co.*, 651 S.W.2d 260, 262 (Tex. 1983).

[21] *Jones v. Blume*, 196 S.W.3d 440, 447 (Tex. App.—Dallas 2006, pet. denied).

[22] *Johnson v. Brewer & Pritchard, P.C.*, 73 S.W.3d 193, 199 (Tex. 2002).

[23] *See Cardiac Perfusion Servs., Inc. v. Hughes*, 436 S.W.3d 790, 791 n.1 (Tex. 2014) (per curiam)(citing *Meyer v. Cathey*, 167 S.W.3d 327, 330–31 (Tex. 2005) ("Informal fiduciary duties arise from a moral, social, domestic, or purely personal relationship of trust and confidence.")).

[24] *Associated Indem. Corp. v. CAT Contracting, Inc.*, 964 S.W.2d 276, 288 (Tex. 1998).

[25] *Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171, 176–177 (Tex. 1997).

There is no question that an escrow agent owes fiduciary duties as a matter of law.[26] Specifically, an escrow agent's fiduciary duty consists of (1) the duty of loyalty, (2) the duty to make full disclosure, and (3) the duty to exercise a high degree of care to conserve the money and pay only those entitled to receive it.[27]

An escrow agent must be appointed through a specific legal document that imparts a specific legal obligation.[28] And an escrow agent's duties are strictly limited to those set forth in the escrow agreement.[29] Here, it is undisputed that there is no escrow agreement between CTS and Flagstar or between CTS and Excel.

There is also no dispute that LSD was the escrow agent in these transactions. Nonetheless, Flagstar contends there was also a formal fiduciary relationship between Flagstar and CTS because CTS *functioned* as an escrow agent for the "closing" of the Loans.[30] Although Flagstar does not assert that CTS was charged with full responsibility for closing the transactions, it maintains CTS was responsible for paying off existing liens on the properties before forwarding the remaining balance of loan funds to LSD. According to Flagstar, the fact that funds were wired directly from Flagstar to CTS into the CTS escrow account is indicative of such a duty.

But Walker explained that the escrow account designation is used to separate funds from the operating account. With regard to the transactions at issue, Walker utilized the CTS escrow account simply as "a place to park the funds." He did not, however receive any instructions

---

[26] *See Chicago Title Ins. Co. v. Alford*, 3 S.W.3d 164, 167 n.2 (Tex. App.—Eastland 1999, pet. denied) (recognizing escrow agent is in fiduciary relationship with contracting parties); *Zimmerman v. First Am. Title Ins. Co.*, 790 S.W.2d 690, 695 (Tex. App.—Tyler 1990, writ denied) (same).

[27] *Bell v. Safeco Title Ins. Co.*, 830 S.W.2d 157, 161 (Tex. App.—Dallas 1992, writ denied).

[28] *Jones v. Blume*, 196 S.W.3d 440, 448 (Tex. App.—Dallas 2006, pet. denied).

[29] *Equisource Realty Corp. v. Crown Life Ins. Co.*, 854 S.W.2d 691, 697 (Tex. App.—Dallas 1993, no writ).

[30] *See Holder–McDonald v. Chicago Title Ins. Co.*, 188 S.W.3d 244, 247 (Tex. App.—Dallas 2006, pet. denied) (concluding any fiduciary duty owed by Chicago Title arose solely out of employee's role as agent and closer for purchase of property).

directing CTS to act as escrow agent for the transactions. In fact, the evidence shows that CTS did not receive specific instructions at all.

Walker testified that CTS was retained by LSD to do the title work on the Loans. CTS and LSD operated under a verbal service agreement, and pursuant to the verbal agreement, CTS was to disburse the funds to LSD. Although a title policy does not issue until after a transaction is closed, CTS paid itself and retained the First American premium before transferring the funds to LSD. Neither Walker nor CTS's accounting manager could recall any other transactions where CTS received all of the money but was to do only title work.

In further support of its argument that CTS owed the fiduciary duty of an escrow agent, Flagstar relies on documents prepared by CTS that list Walker as the "closer." Walker explained, however, that this designation is just a "place-holder" on the form generated by the software. The fact that Walker's name is listed in this column does not mean that he or anyone else at CTS was responsible for closing the transactions. Walker observed that the form could just as easily have said "title processor," or "title officer." Flagstar also attaches significance to the fact that the front page of preliminary HUD-1 forms for thirty-five out of forty transactions list CTS as the "settlement agent," and show CTS's office as the "place of settlement." But there was no testimony or other evidence that CTS was charged with "closing" or final settlement of the transactions.

Oscar Mireless, an Excel employee, testified that the preliminary HUD estimate is prepared by the escrow agent—in this case, LSD—and is then used to prepare lender's instructions. The final HUD forms are not received by the lender until days after a loan is funded, which occurs "after escrow and title do what they have to do." Mireless stated that it was his understanding that LSD was the escrow agent for the Loans, and the escrow agent was the party obligated to act under the closing instructions. Mireless also stated that during a typical

loan process, Excel would have no communication with the title agent. Instead, the escrow agent would communicate with the title agent. The evidence reflects that the absence of such communication with the title agent is what occurred here.

Mireless said it was his understanding that CTS was supposed to pay off the existing liens on the loan properties and then wire the remaining proceeds to LSD. But he also testified that to his knowledge, no one from Excel communicated to CTS or LSD that the title agent was responsible for paying off existing liens. Mireless explained that it would not have been possible for Excel to wire funds directly to LSD because LSD was not on Flagstar's approved list. Therefore, if someone attempted to wire funds to LSD, the Excel system would not allow the wire to proceed.

Significantly, the same preliminary HUD forms upon which Flagstar relies include a line-item listing of fees to be paid in connection with the Loans. For example, exhibits 341, 342, 343, 345, as well as many others, reflect that fees to be received by LSD in connection with the loan include a document preparation fee, wire and courier fees, endorsement and signing fees, and recording and lien satisfaction fees. CTS is listed only as the recipient of an owner's coverage fee.

Exhibit 530, a representative sample of the lender's instructions entitled "Instructions to Escrow/Title/Closing Agent" lists LSD as the escrow agent and CTS as the title agent. These closing instructions provide that LSD is to receive fees for document preparation, wire, courier, endorsements, lien satisfaction, document signing, recording processing, and escrow. The closing instructions for these forty loans, however, are not consistent with this representative sample. For example, Exhibit 543 shows CTS as the recipient of the recording processing and endorsement fees. Exhibit 541 shows CTS as receiving a recording fee. The evidence does not reflect who actually received these fees.

In addition, although Exhibit 530 and some of the other lender instructions show CTS as receiving a fee for "sub escrow," the record does not reflect that a sub escrow of any kind was contemplated, or what it might entail. Moreover, while some of the lender's instructions list CTS or First American next to the line item "sub escrow," others list LSD.

Despite the inconsistency and lack of explanation for the sub escrow line item, Flagstar relies on the testimony of CTS's expert Charles Hansen to suggest that the "sub escrow" designation signified that CTS was obligated to do more than just issue the title commitments for these transactions. Hansen explained that sub escrow is not true escrow; it means "below escrow." Hansen agreed that in some situations, but not all, sub escrow may involve a lender sending funds to a title agent with the expectation that the title agent would use the money to satisfy existing liens and put the lender in a first-lien position. But Hansen also made clear that there was no indication of or instruction for sub escrow on these Loans. In fact, Hansen stated that sub escrow makes no difference in these transactions, and "if Walker stated he had no escrow instructions he would be flat out right."

The lender instructions that Flagstar concedes are ambiguous and inconsistent are the only evidence of any communication of instructions to CTS in connection with the Loans. There is no testimony explaining the inconsistencies, or why Excel prepared the instructions as it did. But "a carefully drawn list of instructions" is the most important element of an escrow.[31] With forty differing and inconsistent sets of lender instructions, it is not possible to conclude that CTS was uniformly instructed to satisfy the prior liens for all Loans. Indeed, from this evidence, no reasonable factfinder could conclude that CTS was charged with the responsibility for prior lien satisfaction with regard to any of these transactions.

---

[31] *See Lacy v. Ticor Title Ins. Co.*, 794 S.W.2d 781, 786 (Tex. App.—Dallas 1990), *writ denied per curium*, 803 S.W.2d 265 (Tex. 1991).

Flagstar insists that if the instructions were not clear, CTS should have contacted the lender to inquire as to the desired disposition of the funds. According to Flagstar, if CTS had contacted Excel, Excel would have instructed CTS to pay off the prior liens. A formal fiduciary relationship, however, is not appropriately grounded upon speculation. Equally important is the fact that there is no evidentiary support in the record for the inference Flagstar seeks to make.

Flagstar points to the fact that CTS solicited business from Flagstar as indicative of the duty it seeks to impose. Specifically, Flagstar observes that CTS solicited Flagstar for the privilege of receiving and handling Flagstar funds in connection with closings of real estate transactions. To this end, First American provided CTS with a closing protection letter. CTS acknowledged that the closing protection letter served to assure Flagstar that CTS could handle escrowed funds. Yet Flagstar supplies no apparent nexus between the general solicitation of its business and the fact that LSD selected CTS to serve as the title agent for these particular Loans. The fact that CTS may have been positioned to serve as an escrow agent handling escrowed funds if selected to do so in some other transaction does not equate to, establish, or even suggest that CTS acted as escrow agent for these Loans. To the contrary, the undisputed evidence reflects that LSD was the designated agent for escrow.

Flagstar further relies on testimony from both Flagstar and Excel employees to the effect that they expected CTS to satisfy prior liens on the property. But "mere subjective trust does not . . . transform arm's-length dealing into a fiduciary relationship."[32] In the absence of specific instructions concerning the funds, the fact that Excel and Flagstar may have had certain expectations is of no consequence to our analysis.

---

[32] *Schlumberger*, 959 S.W.2d at 177; *see Meyer*, 167 S.W.3d at 331.

Flagstar's argument that CTS owed a fiduciary duty is premised on *City of Fort Worth v. Pippin*.[33] Because *Pippin* is distinguishable from the present case, Flagstar's reliance is misplaced.

*Pippin* involved an action by the city against its land agent, title company and the title company's vice-president to recover funds converted by the land agent to his own use.[34] The city's land agent duped the city into authorizing the purchase of property for an amount greater than had been actually negotiated with the sellers.[35] The city sent these greater amounts to the title company with instructions to pay those amounts to the sellers. Instead, contrary to the instructions, the title company paid the sellers a lesser amount and paid the difference to the land agent.[36] Though, as here, there was no formal escrow agreement between the city and the title company, the court imposed on the title company the duties of an escrow agent.[37] The court reasoned that the city had sent its funds to the title company for a specific purpose and that using them for any other purpose entitled the city to sue.[38] The court stated that, even where no formal escrow agreement exists, the title company owed the party remitting those funds "the duty of loyalty, the duty to make full disclosure, and the duty to exercise a high degree of care to conserve the money and pay it only to those persons who are entitled to receive it."[39]

We note at the outset that *Pippin* was decided on an agency theory; it was not a breach of fiduciary duty case.[40] And *Pippin* is factually distinguishable from the instant case. In *Pippin*, the

---

[33] 439 S.W.2d 660, 664–65 (Tex. 1969).

[34] *Id.*

[35] *Id.* at 662.

[36] *Id.*

[37] *Id.* at 665.

[38] *Id.*

[39] *Id.*

[40] *See Wessen v, Jefferson Sav. & Loan Ass'n*, 641 S.W.2d 903, 906 (Tex. 1982) (stating *Pippin* decided on theory that agent owes fiduciary duty to principal).

agent received specific instructions about what to do with the money. Significantly, there were no specific instructions from Excel or Flagstar to CTS. In fact, Flagstar concedes that the instructions were "inconsistent and ambiguous." Unlike CTS, the agent in *Pippin* was responsible for closing, and was being paid a fee for the careful handling of loans. Here, there is no evidence that CTS was responsible for closing or received such a fee. Indeed, CTS's testimony that it was never told to use the funds to obtain first-lien positions for Flagstar is uncontroverted.

Likewise, in *Netco v. Montemayer,*[41] the Houston court concluded that the evidence supported the trial court's conclusion that the entity serving as both escrow and title agent breached its fiduciary duty by failing to secure the release of a prior lien before closing on a property. NETCO, the escrow and title agent, prepared both the settlement statement and the title commitment. The latter reflected the prior lien, but the former did not.[42] NETCO failed to pay the lienholder listed in the title commitment or secure a release of the lien.[43]

Unlike this case, NETCO stipulated at trial that it was obligated to secure a release of the lien.[44] Nonetheless, NETCO argued that the homeowners had signed the settlement statement reflecting that the lien amount had not been deducted, and therefore the homeowners were responsible for the error.[45] The court rejected this argument, noting that the homeowners' failure to catch the error "does not excuse NETCO from liability as a title insurer and escrow agent — it

---

[41] 352 S.W.3d 733, 743–44 (Tex. App.—Houston [1st Dist.] 2011, no pet.),

[42] *Id.*

[43] *Id*. at 743.

[44] *Id.*

[45] *Id*. at 744.

prepared both the settlement statement and the title commitment and was paid a fee for its services and the careful handling of these funds."[46]

In the present case, however, CTS did not serve in the dual role of escrow and title agent. Rather, CTS was designated only to act as title agent. CTS denies that it was responsible for lien satisfaction, and the evidence does not establish otherwise. And as previously discussed, there is no evidence that CTS received a fee for escrow services or satisfying the prior liens.

Flagstar contends that the formal designation of CTS as title rather than escrow agent is immaterial. While we agree that the title that is employed is not necessarily conclusive, here the evidence does not show that the relationship of the parties was anything more than the designation "title agent" suggests.

Courts do not create fiduciary relationships lightly.[47] We decline to do so here. In reaching our conclusion that Flagstar adduced no evidence of a formal fiduciary relationship, we do not hold that a title agent may never be charged with fiduciary responsibilities. Instead, our conclusion is limited to the facts of this case in which the relationship of the parties and the responsibilities of the title agent do not support the imposition of such a duty.

Flagstar also notes that the trial court initially concluded in its ruling on Flagstar's motion for partial summary judgment that Walker and CTS did owe a fiduciary duty to Flagstar. Implicitly, Flagstar seems to suggest that the issues resolved by the summary judgment were final and could not continue to be litigated, even though the order was interlocutory. But a trial court has the inherent right to change or modify any interlocutory order or judgment until the

---

[46] *Id.*

[47] *Envt'l Procedures, Inc. v. Guidry*, 282 S.W.2d 602, 628 (Tex. App.—Houston [14th Dist.] 2009, pet. denied).

judgment on the merits of the case becomes final.[48] After hearing the evidence, the trial court was entitled to conclude, as it did, that CTS did not owe Flagstar a fiduciary duty as a matter of law.

In the alternative, Flagstar argues that to the extent an agreement between CTS and the lender was required to establish a fiduciary duty, there was a fact issue as to whether there was an implied agreement for CTS to provide escrow services. Flagstar's new position is less than clear. In the court below and in its primary argument on appeal, Flagstar has maintained that a formal fiduciary relationship existed under *Pippin* as a matter of law. And we have concluded there was no formal fiduciary relationship as a matter of law.

To the extent that Flagstar now seeks to assert that the evidence raised fact questions concerning the existence of an informal fiduciary relationship, we note that this issue was also not raised in the court below.[49] Further, even if the issue had been preserved for our review, such a relationship would require evidence of a special relationship of trust and confidence that existed separate and apart from these transactions.[50] There is no such evidence here. Therefore, we conclude the trial court did not err in granting a directed verdict on Flagstar's fiduciary duty claim. Flagstar's first two issues are overruled.

### *Bailment*

In its fourth issue, Flagstar contends the trial court erred in granting partial summary judgment on its bailment claim. The only summary judgment evidence Flagstar identifies in support of its bailment claim is: (1) the fact that Walker instructed the lender to wire funds to its escrow account; (2) CTS opened loan files for the transfers; (3) lender instructions (previously discussed); and (4) general testimony by Hansen that title companies typically use funds from

---

[48] *See H.S.M. Acquisitions, Inc. v. West*, 917 S.W.2d 872, 877 (Tex. App.—Corpus Christi 1996, writ denied); *see also Hyundai Motor Co. v. Alvarado*, 892 S.W.2d 853, 855 (Tex. 1995) (per curiam) (stating a partial summary judgment is a decision on the merits unless set aside by the trial court).

[49] *See* TEX. R. APP. P. 33.1.

[50] *See Associated Indem. Corp.*, 964 S.W.2d at 288.

lenders to satisfy existing liens even without express instructions. From this evidence, Flagstar asserts the elements of a bailment were established.[51] Like its breach of fiduciary duty claim, Flagstar asserted the bailment on its own behalf.

In its petition, at the end of its negligence count, Flagstar alleged "[i]n addition or in the alternative, [CTS and Walker] were acting as bailees of the funds and failed to properly safeguard such funds." To create a bailment, there must be (1) delivery of personal property from one person, the bailor, to another, the bailee, for a specific purpose; (2) acceptance of delivery by the bailee; (3) an express or implied contract between the parties that the specific purpose will be realized; and (4) an agreement between the parties that the property will be either returned to the bailor or dealt with according to the bailor's direction.[52] To establish a bailment relationship, the evidence must demonstrate that the entity sought to be charged as bailee knew that it was assuming such relationship and responsibilities before it will be charged with the duties of bailee.[53]

Here, the record reflects and the parties do not dispute the absence of an express bailment contract between CTS and Flagstar. The undisputed evidence shows that the only instructions CTS received came from LSD, and LSD required that CTS remit the funds to LSD so that LSD could close the transactions. Neither Flagstar nor Excel communicated with CTS at all.

Flagstar contends, however, that there was an implied bailment agreement because CTS knew the funds were for real estate transactions and title companies generally know that they are

---

[51] Flagstar uses the phrase "for example" to direct our attention to select summary judgment evidence. We note, however, that "[i]n the absence of any guidance from the non-movant where the evidence can be found, the trial and appellate courts are not required to sift through voluminous deposition transcriptions in search of evidence to support the non-movant's argument that a fact issue exists." *Aguilar v. Morales*, 162 S.W.3d 825, 838 (Tex. App.—El Paso 2005, pet. denied);

[52] *State v. $281,420.00 in United States Currency*, 312 S.W.3d 547, 551 (Tex. 2010); *Cessna Aircraft Co. v. Aircraft Network, LLC*, 213 S.W.3d 455, 462–63 (Tex. App.—Dallas 2006, pet. denied).

[53] *DeLaney v. Assured Self Storage*, 272 S.W.3d 837, 839 (Tex. App.—Dallas 2008, no pet.); *Hoye v. Like*, 958 S.W.2d 234, 237 (Tex. App.—Amarillo 1997, no pet.).

to pay off prior liens. We are not persuaded by this argument. But even if we were to find an implied bailment contract, Flagstar pled its bailment issue as a negligence theory, and it fails to explain how the jury's negligence findings do not render the summary judgment on the bailment issue moot.

A bailment relationship is governed by principles of negligence.[54] That is, a bailment contract gives rise to a duty on the part of the bailee to take reasonable care in safeguarding the property that is the subject of the bailment.[55] Thus, even if there was a bailment contract, Flagstar was still required to prove that CTS breached its duty to exercise reasonable care to protect the funds.[56] The case was pled and submitted to the jury on a negligence theory, and the jury concluded that CTS was not negligent. Flagstar does not challenge the jury's negligence findings. Therefore, we conclude that even if the trial court erred in granting summary judgment on Flagstar's bailment claim, any such error was harmless.[57] Flagstar's fourth issue is overruled.

### *Spoliation*

Prior to trial, Flagstar moved to compel CTS's production of additional communications concerning other transactions between CTS and LSD. CTS explained that the information was not available because it replaced its servers in mid-2009, and had not backed up the data. Flagstar requested a spoliation instruction which the trial court denied. The judge stated, "It's just too hard of a burden to meet and I don't think it was met here." In its third issue, Flagstar argues the trial court abused its discretion in denying the requested instruction. We disagree.

---

[54] *Bank One, Tex., N.A. v. Stewart*, 967 S.W.2d 419, 432 (Tex. App.—Houston [14th Dist.] 1998, pet. denied).

[55] *See Ampco Auto Parks, Inc. v. Williams*, 517 S.W.2d 401, 403 (Tex. Civ. App.—Dallas 1974, writ ref'd n.r.e.).

[56] *See Barker v. Eckman*, 213 S.W.3d 306, 310 (Tex. 2006) (noting that claims for breaches of bailment agreements can be brought as contract or tort claims).

[57] *See Progressive Cnty. Mut. Ins. Co. v. Boyd*, 177 S.W.3d 919, 921 (Tex. 2005).

In a recent decision, the Texas Supreme Court articulated more specific restrictions on a trial court's discretion to give a spoliation instruction to the jury.[58] There, the court held that the trial court may submit a spoliation instruction only if it finds (1) the spoliating party acted with intent to conceal discoverable evidence, or (2) the spoliating party acted negligently and caused the nonspoliating party to be irreparably deprived of any meaningful ability to present a claim or defense.[59] The court observed that whether a party spoliated evidence and whether a particular remedy is appropriate are questions of law for the trial court.[60] Evidence of the circumstances surrounding the alleged spoliation is generally inadmissible at trial because it is largely irrelevant to the merits and unfairly prejudicial to the spoliating party.[61] To this end, the court noted that a spoliation instruction "can, in some sense, be tantamount to a death-penalty sanction," in the sense that such an instruction can remove the focus of the trial from the merits and redirect it to the conduct giving rise to the sanctions.[62]

To find that spoliation occurred, a trial court is charged with making two affirmative determinations. First, the court must find that the party who failed to produce the evidence had a duty to preserve the evidence.[63] "Such a duty arises only when a party knows or reasonably should know that there is a substantial chance that a claim will be filed and that evidence in its possession and control will be material to that claims."[64] Second, the nonproducing party must have breached its duty to reasonably preserve material and relevant evidence.[65]

---

[58] *See Brookshire Bros., Ltd.* v. *Aldridge*, No. 10-0846, 2014 WL 2994435, at *9–10, (Tex. July 3, 2014).

[59] *Id.*

[60] *Id.*

[61] *Id.*

[62] *Id.*

[63] *Id.*

[64] *Id.*

[65] *Id.*

If a court finds that spoliation occurred, it must exercise its discretion in imposing a remedy.[66] In making this determination, the court should weigh the spoliating party's culpability and the prejudice to the nonspoliating party.[67] Prejudice is evaluated based on the spoliated evidence's relevancy to key issues in the case, whether the evidence would have helped or harmed the case, and whether the spoliated evidence was cumulative of other competent evidence.[68]

In the case at bar, the trial court did not abuse its discretion in denying a spoliation instruction because there is no proof that CTS intentionally concealed evidence or that the spoliation irreparably deprived Flagstar of any meaningful ability to present its claims.

At the pre-trial hearing on spoliation, Flagstar did not offer any evidence. At trial, the judge refused to allow Flagstar to cross-examine Walker on the issue, and Flagstar made an offer of proof. Flagstar stated, in pertinent part:

> . . . potential e-mails and communications relating - - some of which would relate to these 40 transactions and some of which would relate to previous LSD transactions that have been discussed today in the evidence in Florida and Colorado during the months before the initiation of the lawsuit were not available.

Flagstar claims the missing communications were pertinent to show "what those communications told CTS about LSD." Although Flagstar argues the missing evidence was relevant to its bailment and breach of fiduciary claims, Flagstar fails to explain how evidence of prior transactions implicate either the existence of a formal fiduciary relationship or an implied bailment in the transactions at issue here. In addition, there was other evidence concerning prior LSD transactions that was available and admitted into evidence. For example, exhibit 441 listed

---

[66] *Id.*

[67] *Id.*

[68] *Id.*

229 cancelled transactions in Colorado. Exhibit 202 included CTS e-mails critical of LSD's business practices. There is nothing to indicate the missing evidence of these other transactions would not have been cumulative. More important, there is nothing to establish or even suggest that the lack of such evidence deprived Flagstar of a meaningful opportunity to present its case. The same holds true with regard to the "potential email" concerning these Loans. Flagstar's third issue is overruled.

### *Vicarious Liability*

In its fifth issue, Flagstar contends the judgment in favor of First American should be reversed because First American is vicariously liable for the conduct of CTS and Walker. In a cross-point, First American argues there is no vicarious liability. Our resolution of Flagstar's first three issues obviates the need to consider the vicarious liability issues.[69] Flagstar's fifth issue and First American's cross-point are overruled.

### *Judicial Estoppel and Res Judicata*

In cross-points, CTS asserts the trial court's judgment should be affirmed on the principles of res judicata and judicial estoppel.[70] We have concluded the trial court's judgment was not in error based on other grounds. Therefore, we need not reach these alternative issues.[71] CTS's cross-points and this portion of Flagstar's second issue are overruled.

---

[69] *See* TEX. R. APP. P. 47.1.

[70] In part of its second issue, Flagstar also contends that the directed verdict was in error "to the extent it was based on judicial estoppel." However, there is nothing to suggest the court's ruling was premised on CTS's judicial estoppel argument, and we have concluded the trial court did not err in its determination that CTS does not owe a fiduciary duty to Flagstar or Excel. We have concluded the trial court's judgment was not in error based on other grounds.

[71] *See* TEX. R. APP. P. 47.1.

## CONCLUSION

Having resolved all of Flagstar's issues against it, we affirm the trial court's judgment.

130724F.P05

/Kerry P. FitzGerald/

KERRY P. FITZGERALD
JUSTICE



## Court of Appeals
## Fifth District of Texas at Dallas

## JUDGMENT

FLAGSTAR BANK, FSB, Appellant

No. 05-13-00724-CV     V.

MARK WALKER AND
CONTEMPORARY TITLE SOLUTIONS,
Appellees

On Appeal from the 429th Judicial District
Court, Collin County, Texas
Trial Court Cause No. 429-04864-2009.
Opinion delivered by Justice FitzGerald.
Justices Fillmore and Stoddart participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is
**AFFIRMED**.

It is **ORDERED** that appellees MARK WALKER AND CONTEMPORARY TITLE
SOLUTIONS recover their costs of this appeal from appellant FLAGSTAR BANK, FSB.

Judgment entered November 14, 2014.